FAIGENBAUM v OAKLAND MEDICAL CENTER

Docket No. 67356. Submitted April 1, 1985, at Detroit.—Decided June 3, 1985. Leave to appeal applied for.

Neil Faigenbaum, as guardian of the person of Anita Katz, a mental incompetent, filed an action against 11 doctors, 2 hospitals, and 3 drug companies in Wayne Circuit Court alleging medical malpractice and products liability. In addition to that action, Faigenbaum filed malpractice actions against Oakland Medical Center and Clinton Valley Center in the Court of Claims. Plaintiff's complaint in the second action also asserted a breach of contract claim. The Court of Claims action was joined for trial with the suit in Wayne Circuit Court. Prior to trial, plaintiff settled with four of the doctors, the two hospitals, and the three drug companies for $278,000. During trial, settlement with two more of the doctors netted plaintiff another $100,000. The remaining doctors were dismissed from the suit either on grounds of governmental immunity, settlement, or directed verdict. Summary judgment was granted to Clinton Valley Center on all counts against it on the basis of governmental immunity and summary judgment was granted to Oakland Medical Center on the breach of contract claim, Harold Hood, J. Following trial on plaintiff's malpractice claims against Oakland Medical Center, the court ruled that the center was not entitled to governmental immunity and that the treatment Anita Katz received at the center was well below the standard of care to be expected and that the treatment received contributed to the severity of Katz's condition. The court ruled that $1,000,000 would fairly and adequately compensate Katz

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 57 Am Jur 2d, Municipal, School, and State Tort Liability § 27 *et seq.*
    Modern status of rule excusing governmental unit from tort liability on theory that only general, not particular, duty was owed under circumstances. 38 ALR4th 1194.
[2] 5 Am Jur 2d, Appeal and Error §§ 728, 729.
    Prospective or retroactive application of overruling decision. 10 ALR3d 1371.
[4] 5 Am Jur 2d, Appeal and Error § 937 *et seq.*
[5] 46 Am Jur 2d, Judgments § 621 *et seq.*

for the damages she suffered because of the substandard care she received. Judgment was entered in the amount of $622,000, representing $1,000,000 in damages, less the $378,000 which plaintiff had received in settlements. Orders were also entered awarding plaintiff attorney fees of $30,000, expert witness fees of $14,500, and $1,015 in other witness and service fees. Oakland Medical Center Appeals. *Held:*

1. In view of the Supreme Court's recent ruling in *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567 (1984), dealing with governmental immunity, the judgment of the trial court should be reversed and remanded for entry of no cause of action on the tort claims. Oakland Medical Center is entitled to governmental immunity under the criteria set forth in *Ross.*

2. Plaintiff failed to preserve the issue of whether the trial court's ruling on his breach of contract claim was correct. Therefore, the trial court's grant of summary judgment on the breach of contract claim is affirmed.

Affirmed in part, reversed in part, and remanded.

1. GOVERNMENTAL IMMUNITY — TORTS.

All governmental agencies are immune from tort liability for injuries arising out of the exercise or discharge of a nonproprietary, governmental function; governmental function is defined as any activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law.

2. APPEAL — RETROACTIVITY.

Generally, full retroactivity is the rule and prospectivity is the exception for application of decisions of appellate courts; retroactivity may be limited, however, when a balancing of three factors so dictates: (1) the purpose of the new rule; (2) the general reliance upon the old rule; and (3) the effect of retroactive application of the new rule on the administration of justice.

3. GOVERNMENTAL IMMUNITY — TORTS — GOVERNMENTAL FUNCTION.

The fact that a fee is charged for a particular portion of service, or that an incidental profit may be derived from such fees, does not transform an obvious governmental function into a proprietary one for purposes of determining whether the provider of the service is entitled to governmental tort immunity.

4. APPEAL — MODIFICATION OF JUDGMENTS — NONAPPEALING PARTIES.

An appellate court cannot modify a judgment to benefit a nonappealing party.

5. JUDGMENTS — FINALITY OF JUDGMENTS.
    The decision of a court having jurisdiction is final when not appealed and cannot be collaterally attacked.

*Fieger & Fieger, P.C.* (by *Geoffrey N. Fieger*), for plaintiff.

*Frank J. Kelley*, Attorney General, *Louis J. Caruso*, Solicitor General, and *James M. Batzer*, Assistant Attorney General, for defendant.

Before: BRONSON, P.J., and J. H. GILLIS and ALLEN, JJ.

ALLEN, J. In this medical malpractice action defendant appeals as of right from a trial court's award of $1,000,000 in damages, $30,000 attorney fees, and $14,500 expert witness fees to plaintiff. The award followed a trial which commenced on May 17, 1982, and ended July 27, 1982.

## FACTS

The action began when plaintiff sued 11 doctors, 2 hospitals and 3 drug companies in Wayne County Circuit Court. Suit against the drug companies was under a products liability theory and action against the other defendants was predicated on malpractice. Separately, plaintiff brought malpractice actions in the Court of Claims against Oakland Medical Center and Clinton Valley Center. Plaintiff's complaint and first amended complaint alleged in count III a breach of contract claim. Pursuant to the provisions of § 6421 of the Revised Judicature Act, MCL 600.6421; MSA 27A.6421, the Court of Claims action was joined for trial with the suit in Wayne County Circuit Court.

Prior to trial the number of defendants was

substantially reduced. Summary judgment was granted to Clinton Valley Center on all counts of plaintiff's complaint, and summary judgment was granted to Oakland Medical Center on plaintiff's count III breach of contract claim. Settlement was made with four doctors, two hospitals and three drug companies for $278,000. During trial, settlement was reached with two other named doctors for $100,000. The doctors who treated Anita Katz at Clinton Valley Center were dismissed from the suit either on grounds of governmental immunity, settlement, or directed verdict because of lack of evidence of responsibility for Anita Katz's care. Thus, at the close of plaintiff's proofs, plaintiff had received settlements totaling $378,000 and the principal remaining defendant was Oakland Medical Center on plaintiff's claim in tort.

At trial, the principal proofs concerned Anita Katz's suffering from tardive dyskinesia and the failure of the doctors and staff at the Oakland Medical Center to properly diagnose that condition and prescribe the proper treatment therefor. It was plaintiff's theory, supported by proofs at trial, that Anita Katz was not mentally ill when she was admitted to Clinton Valley Center and Oakland Medical Center but through a series of misdiagnoses was negligently administered drugs which only made her condition worse and which in fact were the cause of her illness in the first instance. Tardive dyskinesia is a movement disorder consisting of abnormal sterotyped movements of the mouth, face, limbs and tongue which occurs late in the course of neuroleptic drug treatment. Some of these manifestations are protrusion and rolling of the tongue, chewing movements, smacking and pouting of lips, opening and closing of mouth, puffing cheeks, grimacing, eye blinking, rocking movements, choreo-athetoid movements of the

limbs, swallowing and respiratory dyskinesia. Tardive dyskinesia is drug induced by neuroleptic drugs such as Thorazine, Mellaril, and Haldol. Similar abnormal twitching and body movements are found in persons suffering from Huntington's Chorea. However, that disease is not drug induced but is a degenerative disease in which the nerve cells in various parts of the brain decay, degenerate, and die.

Plaintiff's medical expert, Dr. Robert Sovner, testified that any psychiatrist or neurologist who sees an individual with abnormal choreo-athetoid movements and who has a history of exposure to neuroleptic drugs is required to consider tardive dyskinesia as a possible diagnosis. He further testified that after the onset of tardive dyskinesia, the continued prescription of neuroleptic drugs could either: (1) prevent physicians from knowing the severity of the disorder (mask it) or (2) convert a reversible case into an irreversible one. Drug therapy should be discontinued even where it is known the condition is irreversible.

Dr. Sovner reviewed Anita Katz's medical records and made an opinion about the care she received at Clinton Valley Center, where she was admitted November 20, 1976. He also saw videotapes of Anita Katz on February 9, 1979, and January 23, 1980. On both tapes, she showed tardive dyskinesia. He believed she had it during her stay at Clinton Valley Center. In her records, he was unable to find any differential diagnosis of tardive dyskinesia. This was so even though a social service summary indicated that Anita Katz had had Thorazine and shock therapy in the past. The doctors, having seen her movements and accounting for her drug history, should have diagnosed tardive dyskinesia. There was no evidence that anyone from either Oakland Medical Center

or Clinton Valley Center considered tardive dyskinesia. This, he opined, was well below the standard of care. The doctors continued to give her neuroleptic drugs. This, too, was below the standard of care.

Sovner further testified that when Anita Katz was admitted to Clinton Valley Center she was suffering from tardive dyskinesia and that Dr. Joseph Chandler, neurologist at Oakland Medical Center, diagnosed Anita Katz's condition as Huntington's Chorea and prescribed Haldol, a neuroleptic drug, for her. Sovner stated that Anita Katz never had Huntington's Chorea, that she never should have been given Haldol, and that the treatment she received at Clinton Valley contributed to the severity of her condition. In essence, plaintiff's proofs established a prima facie case that Anita Katz should have been treated for nonmental disorders.

In an opinion dated July 27, 1982, the trial judge ruled that Oakland Medical Center was not shielded by the cloak of governmental immunity merely because it was part of the Department of Mental Health. He felt that Dr. Chandler fell well below the standard of care in his consultation with plaintiff's ward, Anita Katz. The court concluded that Dr. Chandler had completely missed the diagnosis of tardive dyskinesia. He had a duty, the judge opined, to seek out Anita Katz's medical record, to take a drug history, and to be aware of the contents of the package inserts warning of tardive dyskinesia as a potintial side effect accompanying Haldol. Anita Katz, he found, had tardive dyskinesia when she entered Clinton Valley in November, 1976.

A total sum of $1,000,000, the court ruled, would fairly and adequately compensate Katz for damages she suffered because of Dr. Chandler's devia-

tion from the standard of care. On September 24, 1982, judgment was entered in the amount of $622,000, representing $1,000,000 in damages, less the $378,000 which plaintiff had received in settlements. Subsequently, orders were entered awarding attorney fees of $30,000, expert witness fees of $14,500, and $1,015 in other witness and service fees.

## ISSUES

Six issues are raised on appeal, of which we find the first issue dispositive.[1] Accordingly, our analysis is confined to that issue alone. Briefs on appeal were submitted in late fall 1984, well prior to the Supreme Court's December 28, 1984, decision in *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567; 363 NW2d 641 (1984). At that time controlling law on the question of governmental immunity for state operated mental and medical hospitals was found in *Parker v Highland Park,* 404 Mich 183; 273 NW2d 413 (1978), and *Perry v Kalamazoo State Hospital,* 404 Mich 205; 273 NW2d 421 (1978). Under those decisions the operation of a mental hospital was a governmental function entitled to immunity while the operation of a general care hospital was not a governmental function and was not entitled to immunity.

Proofs at trial disclosed that although defendant Oakland Medical Center was under the jurisdiction of the Michigan Department of Mental Health and as such was a sub-unit of Clinton Valley

[1] (1) Was defendant engaged in a governmental function which rendered it immune from liability? (2) Was Dr. Chandler negligent in his neurological consultations? (3) Were the damages excessive? (4) Did the release and covenant not to sue given Dr. Chandler release and discharge defendant? (5) Did the trial court err in awarding $30,000 in attorney fees and expert witness fees? (6) Should the damage award be reduced by $104,594 to prevent double recovery?

Center, a recognized state mental hospital, it functioned as a general care medical hospital. As such it treated patients requiring special medical treatment or surgical treatment and those who needed special diagnostic studies or who had medical or surgical problems, *e.g.,* fractures, abdominal problems, cancers, pneumonias, etc. The referrals came from other agencies within the department, other state psychiatric hospitals, and other centers for the retarded. By 1978, a pattern of contractual services for medical-surgical care of mental patients by community-based hospitals was so widespread that Oakland Medical Center stopped receiving patients and went out of existence. After hearing the testimony, the respected trial court concluded that based upon how defendant Oakland Medical Center operated, *viz.:* as a general care medical facility with nonpsychiatrist medical doctors at its head, it more appropriately fell within the ambit of *Parker, supra,* and was not protected by governmental immunity. The parties' briefs, as initially submitted on appeal, focused on the factual basis developed at trial and, based on those facts, whether Oakland Medical Center's treatment of Anita Katz fell within the ambit of *Parker.*

Upon release of *Ross, supra,* it became obvious that new rules of immunity were adopted. Supplemental briefs were filed in March and April, 1985. Plaintiff's supplemental brief set forth three new issues: (1) *Ross* did not specifically overrule the *Parker* decision, and, therefore, the holding in *Parker* remains the law; (2) the operation of Oakland Medical Center was a "proprietary function" which, under *Ross,* 420 Mich 614, was not entitled to immunity from tort liability; and (3) plaintiff is entitled to judgment on the count III breach of contract claims, which were improperly struck

prior to trial. With this background, we now address the impact of *Ross* on plaintiff's claim in tort and in contract.

## TORT CLAIM

*Ross* definitely expands the limits of governmental immunity. In so doing, all previous tests for determining whether a governmental activity was a "governmental function" were discarded. 420 Mich 596, 610-620. Included in the scrapheap are *Parker* and *Perry*. Immunity under § 7 of the governmental immunity act, MCL 691.1407; MSA 3.966(107), as that section is construed in *Ross,* is conferred on all governmental agencies for all tort liability whenever the agencies are discharging any governmental function.

"We therefore conclude that a governmental function is an activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law. When a governmental agency engages in mandated or authorized activities, it is immune from tort liability, unless the activity is proprietary in nature (as defined in § 13) or falls within one of the other statutory exceptions to the governmental immunity act. Whenever a governmental agency engages in an activity which is not expressly or impliedly mandated or authorized by constitution, statute, or other law (*i.e.,* an *ultra vires* activity), it is not engaging in the exercise or discharge of a governmental function. The agency is therefore liable for any injuries or damages incurred as a result of its tortious conduct." (Footnote omitted.) 420 Mich 620.

Applying the above test to the nine cases included with *Ross,* the Supreme Court made clear that immunity now extends to almost every lawful governmental activity. If the activity is one specifically authorized by statute, extension of immunity

is automatic unless the activity is proprietary or falls within one of the statutory exceptions.

Even where the activity is not explicitly authorized by statute, if the activity is reasonably implied it remains immune. Thus, in several cases involving the Department of Mental Health and the Department of Social Services, immunity extended to field trips taken for retarded or mentally ill persons under the care of those agencies, even though field trips are not specifically authorized by statute, because each of those agencies' responsibility is for the care and custody of their charges. Such care and custody, under modern methods, includes field trips or similar activity designed to foster training or rehabilitation.

Necessarily, we address the issue of retroactivity. Does the new definition of governmental immunity apply prospectively only or does it extend retroactively to cases on appeal where the question of immunity was an issue? The *Ross* Court did not say how, temporally, its decision should be applied. The general rule in Michigan is that decisions of appellate courts are to be given full retroactivity unless limited retroactivity is justified. See *King v General Motors Corp,* 136 Mich App 301, 306; 356 NW2d 626 (1984); see generally, Mocdy, *Retroactive Application of Law-Changing Decisions in Michigan,* 28 Wayne L Rev 439, 508 (1981); see also *Tebo v Havlik,* 418 Mich 350, 360-361, 369; 343 NW2d 181 (1984), *reh den* 419 Mich 1201 (1984); *Murray v Beyer Memorial Hospital,* 409 Mich 217, 222-223; 293 NW2d 341 (1980), and *Myers v Genesee County Auditor,* 375 Mich 1, 11; 133 NW2d 190 (1965).

The following considerations are pertinent to the issue of whether *Ross* should be given full retroactivity, limited retroactivity, or prospectivity only: (1) the purpose of the new rule, (2) the general

reliance upon the old rule, and (3) the effect of full retroactive application of the new rule on the administration of justice. *King, surpa,* p 306; 28 Wayne L Rev, p 462; see also Anno, 10 ALR3d 1371, 1386.

The purpose of the new rule was to clarify the Court's position on immunity in view of the death of Justice MOODY, who held the swing vote on immunity issues. Given the new composition of the Court, it was necessary that the old rule be clarified. There was little reliance on the "old rule" since by and large the "old rule" was a composition of plurality opinions. Furthermore, it was common knowledge within the bar that the Supreme Court had granted leave in various cases and would soon announce a clarifying opinion. Basically, *Ross* is a much needed and generally anticipated clarifying opinion. As such, it is entitled to limited retroactivity. Under limited retroactivity it will apply to *Ross* itself, to all cases on appeal at the time it was decided, and to all future cases. However, it will not apply to decisions already finalized; those decisions need not be reopened.[2]

We also disagree with plaintiff's claim that the operation of Oakland Medical Center was a propriety function. While *Ross* clearly reaffirmed the pre-*Ross* rule that a proprietary function is not entitled to governmental immunity, proprietary function is defined as any activity *conducted primarily for pecuniary profit.* MCL 691.1413; MSA 3.996(113). The fact that a fee is charged for a particular portion of service, or that an incidental profit may be derived from such fees, does not

---

[2] "The overruled decisions, of course, remain the law of the case with respect to the particular cases in which rendered. *Donohue v Russell* [264 Mich 217; 249 NW 830 (1933)]." *Daley v LaCroix,* 384 Mich 4, 17; 179 NW2d 390 (1970).

transform an obvious governmental function into a proprietary one. 420 Mich 612. In this age of massive state subsidies for health care, it cannot be seriously maintained that the operation of a governmental care facility is a "proprietary function".

Application of *Ross* to the instant case compels a finding of immunity in tort for defendant. Oakland Medical Center, as part of the Department of Mental Health in 1976 and 1977, was a governmental agency entitled to the broadest possible immunity from tort liability for injuries arising out of the exercise or discharge of a nonproprietary governmental function. Oakland Medical Center is immune if its activities were expressly or impliedly mandated by constitution, statute or other law. The purpose, powers and duties of the Department of Mental Health are set forth in MCL 330.1116; MSA 14.800(116). Under that provision, the department is authorized to function in the areas of mental illness and other neurological impairment or disease, and provide any type of patient service, including treatment and care. It may operate, directly or through contractual arrangement, such facilities as are necessary and appropriate.

MCL 330.1708; MSA 14.800(708) gives the standard for mental health services:

"A resident is entitled to mental health services suited to his condition and to a safe, sanitary, and humane living environment."

See, also, 1979 AC, R 330.1269 (hospitals shall have available service of psychiatrists and other physicians), R 330.1281 (health care of every patient shall be under the supervison of a physician), and R 330.4005. 1979 AC, R 330.7151(10) provides:

"(10) A resident shall receive prompt and adequate medical treatment for physical ailments and for the prevention of illness or disability which meet standards of the medical community."

Additionally, medical diagonostic services are provided for as a right of recipients of mental health care under 1979 AC, R 330.7161:

"(1) Medical diagnositic services shall be provided only on request of a physician.
"(2) A facility shall have provision for promptly and conveniently obtaining required clinical laboratory, x-ray, and other diagnostic services.
"(3) Results of clinical tests shall be immediately brought to the attention of the physician and incorporated in the clinical record."

Clearly, Anita Katz's treatment by Dr. Chandler at Oakland Medical Center was expressly and impliedly authorized by the constitution, statutes and regulations of this state. The medical-surgical services were provided as part of the Department of Mental Health's mandate to provide for the total health care of its residents, including Anita Katz. Additionally, Dr. Stehman testified that the Department of Mental Health is responsible for the physical and mental care of mental patients.

Accordingly, we hold that in view of the Supreme Court's ruling in *Ross,* which we find applicable to the case before us, the judgment of the trial court should be reversed and the matter is remanded for entry of no cause of action on the claims in tort. Whether or not the trial court erred in granting summary judgment on the claims in contract in count III is the subject we next address.

CONTRACT CLAIM

We have previously noted that plaintiff's complaint against Clinton Valley Center and Oakland

Medical Center set forth counts both in tort and in contract and that prior to trial summary judgment was granted to Clinton Valley Center as to all counts and was granted to defendant Oakland Medical Center as to the count in contract. On May 4, 1982, plaintiff moved for reconsideration, asserting that, if it was eventually determined that Oakland Medical Center was immune from tort liability, the breach of contract claim would still survive. That motion was denied. On June 7, 1982, after learning of this Court's decision in *Rocco v Dep't of Mental Health,* 114 Mich App 792, 800-801; 319 NW2d 674 (1982), plaintiff again moved to reinstate the breach of contract claim against Oakland Medical Center.[3] That motion too was denied, the trial judge stating that he was "not convinced by *Rocco* at all". No appeal was taken from that decision, nor was any taken when leave to appeal was granted by the Supreme Court in *Rocco* or *Ross.*

However, after the Supreme Court's decision December 28, 1984, in *Ross* and *Rocco,* plaintiff submitted a supplemental brief which for the first time on appeal to us raised the issue of liability on plaintiff's claim in contract. Defendant submits that the issue is not properly before us, since an appellate court cannot modify a judgment to benefit a nonappealing party. *Ponke v Rusinowski,* 241 Mich 629; 217 NW 765 (1928). Plaintiff argues that as long as he was the appellee in a decision awarding $1,000,000 there was no reason to appeal the adverse decision on the count in contract and

---

[3] Plaintiff's complaint in *Rocco* alleged that plaintiff was a paying patient at the Ypsilanti Psychiatric Hospital. In a 2-1 decision, our Court held that, if the plaintiffs could present satisfactory proofs establishing a contract and a breach of the contract, they could recover because governmental immunity does not bar a breach of contract action. 114 Mich App 800. *Rocco* was decided April 6, 1982. Leave to appeal was granted March 25, 1983, to be submitted and argued together with *Ross v Consumers Power,* 417 Mich 934 (1983).

that as soon as he learned of the decision in *Ross-Rocco* he raised the issue in a supplemental brief.

Attached to the supplemental brief is a copy of plaintiff's exhibit 33 introduced at trial. That exhibit discloses two payments of $450 each by Blue Cross for the care and treatment of Anita Katz at Clinton Valley Center and Oakland Medical Center. Blue Cross makes payments upon each admission and Anita Katz was admitted first on November 20, 1976, and a second time on October 22, 1977, after being transferred back from Sinai Hospital. It is plaintiff's theory that the Blue Cross payments as a matter of law established a contract. Defendant contends that Anita Katz's bill at Clinton Valley-Oakland Medical was some $30,000 and that a third-party partial payment of $450 does not establish a promise to pay. Defendant additionally cites four rules of contract law as to why plaintiff did not and could not establish the existence of an express or implied contract.[4]

The question of whether there was or was not a valid contract between the parties was never addressed by the trial court. Certainly, we cannot rule on that issue in the absence of proofs being taken at the trial level. Further, when not appealed, the decision of a court having jurisdiction is final and cannot be collaterally attacked. *Gursten v Kenney,* 375 Mich 330; 134 NW2d 764 (1965).

"We disapprove of the * * * attempt to have this Court review its arguments as to liability in the absence of a cross-appeal. Our appellate procedure is

---

[4] (1) Defendant was operating under a pre-existing duty to provide care for Anita Katz; (2) no mutuality of obligation existed since defendant's care was not dependent upon consideration being paid by Anita Katz or her family; (3) by statute Oakland Medical Center was required to seek reimbursement from an insurance carrier; (4) the contract is barred by the statute of frauds, MCL 566.132; MSA 26.922.

designed to focus the issues on appeal and provide parties with an opportunity to fully brief and argue *those* issues. This purpose is frustrated by the injection of new issues in the answering brief. *Appellees wishing to challenge rulings adverse to them should do so directly by way of a cross-appeal.*" (Emphasis in last sentence added.) *Peisner v Detroit Free Press, Inc,* 421 Mich 125, 129, fn 5; 364 NW2d 600 (1985).

The Supreme Court granted rehearing in *Ross* and leave to appeal in *Rocco* on March 25, 1983. Similar orders were issued in six other immunity cases which were to be argued with *Ross.* Clearly, the practicing bar was on notice that the former rules concerning governmental immunity would be changed. Yet plaintiff did not take a cross-appeal. If plaintiff had wished to preserve any rights he felt due him, he should have filed an appeal from the trial court's dismissal of the breach of contract claim, or at least subsequently within 18 months have requested leave to file a delayed appeal under GCR 1963, 806.2. Having failed to do so, the trail court's grant of summary judgment on the breach of contract claim is affirmed. See *Treece v Greyhound Bus Co,* 63 Mich App 63, 67-68; 234 NW2d 404 (1975).

The judgment entered by the trial court on the claim in contract is affirmed. The judgment entered by the trial court on the claim in tort is reversed and the matter remanded for entry of judgment of no cause for action. No costs, a question of paramount public importance being involved.