HYDE v UNIVERSITY OF MICHIGAN BOARD OF REGENTS

FAIGENBAUM v OAKLAND MEDICAL CENTER

POWERS v PEOPLES COMMUNITY HOSPITAL AUTHORITY

Docket Nos. 74541, 77213, 77815. Argued March 4, 1986 (Calendar Nos. 6-8). Decided October 3, 1986.

James P. Hyde and Marcia Hyde, in 1976, brought a medical malpractice action in the Court of Claims against the University of Michigan Board of Regents, alleging that the negligence of employees of the University of Michigan Hospital in diagnosing and treating Marcia Hyde resulted in a serious post-surgical infection. A pretrial summary filed in 1977 noted that the plaintiffs could amend their pleadings to allege that the injury arose out of the performance of a proprietary function. Further proceedings were held in abeyance pending decision in *Parker v Highland Park,* 404 Mich 183 (1978), and *Murray v Beyer Memorial Hospital,* 409 Mich 217 (1980). In 1982, the plaintiffs amended their complaint, alleging that the hospital had engaged in a proprietary function. The court, Paul R. O'Connell, J., granted accelerated judgment for the defendant on the ground that the plaintiffs had not made or preserved an express challenge to the defense of governmental immunity until after *Parker* was decided and that the holding of *Parker,* that public general hospitals could be held liable for torts committed during day-to-day operations, thus was not applicable. The Court of Appeals, J. H. GILLIS, P.J., and ROBINSON, J. (T. M. BURNS, J., dissenting), affirmed in an unpublished opinion per curiam (Docket No. 69664). The plaintiffs appeal. Their application for leave to appeal was pending at the time *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567 (1984), was issued.

Neil Faigenbaum, as guardian of Anita Katz, a mental incompetent, brought actions in the Wayne Circuit Court alleging

REFERENCES

Am Jur 2d, Hospitals and Asylums § 20 *et seq.*

Am Jur 2d, Municipal, School, and State Tort Liability § 33 *et seq.*

Am Jur 2d, States, Territories, and Dependencies § 99 *et seq.*

See the annotations in the ALR3d/4th Quick Index under Governmental Immunity or Privilege.

malpractice and products liability against certain doctors, hospitals, and drug companies, and in the Court of Claims against Oakland Medical Center and Clinton Valley Center alleging damages, arising from the treatment of Ms. Katz. The actions were consolidated for trial. Prior to trial, several doctors were dismissed, and the plaintiff settled with the other doctors, the hospitals, and the drug companies. The Wayne Circuit Court, Harold Hood, J., granted summary judgment for Clinton Valley Center on the ground of governmental immunity, and granted judgment for the plaintiff against Oakland Medical Center, finding that it could be held liable under *Parker* because it rendered only general medical care. Oakland's appeal was pending in the Court of Appeals when *Ross* was decided. The Court of Appeals, Bronson, P.J., and J. H. Gillis and Allen, JJ., reversed, holding that under *Ross* Oakland Medical Center was entitled to governmental immunity on the ground that the medical treatment rendered by it was expressly or impliedly authorized by the state constitution, statutes, and administrative regulations (Docket No. 67356). The plaintiff appeals.

Kathleen Powers, for herself and as personal representative of the estate of Frank R. Powers, deceased, brought an action in the Wayne Circuit Court against Peoples Community Hospital Authority, Bernard Bercu, M.D., and N. Jahan, M.D., alleging medical malpractice in the treatment of Mr. Powers. Settlement was reached with Dr. Bercu prior to trial. The court, Robert J. Colombo, Jr., J., granted partial summary judgment for the hospital authority to the extent that the plaintiff sought to hold it vicariously liable for Dr. Bercu's negligence. Following the decision in *Ross,* the court, Paul S. Teranes, J., granted summary disposition for the hospital authority on the ground of governmental immunity, finding that the operation of the hospital by the authority amounted to a governmental function. The Supreme Court granted the plaintiff leave to appeal prior to decision by the Court of Appeals.

In each of the cases, the plaintiffs seek to hold a public general hospital or medical facility vicariously liable for the negligent diagnoses, treatment, or care rendered by the hospital's employees or agents. The plaintiffs maintain that such facilities can be held liable in tort under *Parker.*

In an opinion by Justice Cavanagh, joined by Chief Justice Williams and Justices Brickley, Boyle, and Riley, the Supreme Court *held:*

The rules articulated in *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567 (1984), apply to all cases commenced after January 22, 1985, and to those cases pending either in

trial or appellate courts on January 22, 1985, in which a governmental immunity issue was properly raised and preserved. To the extent that the diagnosis, treatment, and care of patients at a public general hospital or medical facility are activities which are expressly or impliedly mandated or authorized by constitution, statute, or other law, the hospital or facility is entitled to immunity from tort liability under MCL 691.1407; MSA 3.996(107). To the extent that *Parker v Highland Park,* 404 Mich 183 (1978), held that such activities do not constitute the exercise or discharge of a governmental function, it was impliedly overruled by *Ross.* Only activities which are conducted primarily for the purpose of producing a pecuniary profit and which are not normally supported by taxes or fees can be deemed proprietary functions under MCL 691.1413; MSA 3.996(113).

1. Where case law in general is confused and irreconcilable and a new decision of the Supreme Court overrules prior law or reconstrues a statute, limited retroactive application of the decision is favored. Although no indication was given in *Ross* as to whether its application should be retroactive or prospective only, because of the uncertainty surrounding the law of governmental immunity at the time it was decided, it is to be given only limited retroactive effect, so as to apply to cases commenced after the date of decision and to those pending in trial or appellate courts on that date in which a governmental immunity issue was raised and preserved. Thus, in these cases, *Ross* applies.

2. The holding in *Parker* that the operation of a public general hospital was not a governmental function under the governmental immunity act was impliedly overruled by *Ross.* Under *Ross,* a public general hospital or medical facility is engaged in the exercise or discharge of a governmental function whenever its activities are expressly or impliedly mandated or authorized by constitution, statute, or other law. 1986 PA 175, enacted in response to *Ross,* codified the definition of governmental function provided in *Ross.* The act, however, specifically permits imposition of tort liability upon a governmental agency which owns or operates a public general hospital or county medical facility. Thus, the effect of the decision in these cases, extension of governmental immunity from tort liability to a governmental agency operating a public general hospital or medical facility, is limited to causes of action accruing prior to July 1, 1986, which were pending on January 22, 1985, or commenced on or after that date. In causes accruing on or after July 1, 1986, a governmental agency may be

held liable for torts arising out of the ownership or operation of a public general hospital or a county medical facility.

3. Vicarious tort liability may only be imposed upon a governmental agency where: the employee or agent committed a tort while acting in the course of employment and within the scope of authority, and the employee or agent committed the tort while engaged in an activity which was nongovernmental or proprietary or which fell within an exception to the governmental immunity act. Before an activity may be deemed proprietary, it must have been conducted primarily for the purpose of producing a pecuniary profit, and it must be an activity not normally supported by taxes or fees. An activity need not generate a profit to be deemed a proprietary function, but tort liability may be imposed only where the primary purpose of the activity is to generate a pecuniary profit. Also relevant is where a profit is deposited and how it is spent.

4. In these cases, there is no suggestion that the employees or agents were acting outside the course of employment or scope of authority when the alleged torts were committed. In each case, the diagnoses and treatment of the patients were activities implicitly authorized by statute, and, thus, the employees were engaged in the exercise or discharge of a governmental function. In *Hyde,* the lower courts never passed on the merits of the plaintiffs' proprietary function claim, and their amended complaint failed as a matter of law to state a cause of action within the proprietary function exception of § 13 of the governmental immunity act. In *Faigenbaum,* the proprietary function argument was not preserved for review. In *Powers,* the conclusion of the trial court that the primary purpose of the authority in operating its hospitals was not for profit was not clearly erroneous.

*Hyde* and *Powers,* affirmed.

*Faigenbaum,* affirmed in part, reversed in part, and remanded.

Justice LEVIN, joined by Justice ARCHER, dissenting, stated that a governmental agency operating a general hospital is subject to tort liability under *Parker v Highland Park,* where the cause of action arose before July 1, 1986, the effective date of 1986 PA 175. *Parker* held that the operation of a general hospital was not a governmental function within the meaning of the governmental tort liability act. *Ross v Consumers Power* held that operations without an equivalent counterpart in the private sector and largely funded by taxes are governmental functions within the intendment of the act, and defined "governmental function" as an activity expressly or impliedly mandated or authorized by constitution, statute, or other law. The

question whether a governmental agency is immune from or subject to tort liability in respect to the operation of a hospital was not presented and could not have been decided in *Ross.*

The Legislature, in enacting 1986 PA 175, adopted both the definition of governmental function articulated in *Ross* and the concept expressed in *Parker* that a governmental agency operating a general hospital was subject to tort liability. In so doing, it did not mean to imply that it believed *Ross* impliedly overruled *Parker,* but rather that the *Ross* definition was deficient and inconsistent with sound public policy with respect to general hospitals.

The codification of the *Ross* definition in 1986 PA 175 as amended by the exception for general hospitals did not become effective until July 1, 1986. The effective date provides no basis to draw the inference that the unamended *Ross* definition is to be in effect before July 1, 1986, or that it is codified for the period of January 22, 1985, to June 30, 1986. It can as readily be argued that the application of the *Ross* definition of governmental function before July 1, 1986, was rejected by the Legislature, as that the continued application of *Parker* through June 30, 1986, was rejected.

Justice ARCHER, dissenting, stated that the Legislature, in providing in 1986 PA 175 that tort liability may be imposed upon a governmental agency that owns or operates a public general hospital or county medical facility, approved the continuing validity of the rule of *Parker* that public general hospitals are not immune from tort liability. None of the cases in *Ross* involved that issue. Extending governmental immunity in these cases is particularly unjust in light of the remedy provided by *Parker* and the redress afforded similarly situated plaintiffs whose causes arise after 1986 PA 175. Agency liability should be determined by focusing upon the specific act or omission of the agency, not its overall governmental objective. To state that an activity is mandated or authorized by law adds little to the analysis required to determine the nature of an agency's responsibilities and whether its specific acts went beyond its public mandate.

143 Mich App 303; 373 NW2d 161 (1985) affirmed in part and reversed in part.

*Parker v Highland Park,* 404 Mich 183; 273 NW2d 413 (1978), overruled.

### OPINION OF THE COURT

1. GOVERNMENTAL IMMUNITY — GOVERNMENTAL AGENCIES.
   The rules articulated in *Ross v Consumers Power Co (On Rehear-*

*ing),* 420 Mich 567 (1984), apply to all cases commenced after January 22, 1985, and to those cases pending either in trial or appellate courts on January 22, 1985, in which a governmental immunity issue was properly raised and preserved.

2. GOVERNMENTAL IMMUNITY — PUBLIC HOSPITALS — GOVERNMENTAL FUNCTION — CARE OF PATIENTS.

In cases commenced after January 22, 1985, invoking causes of action accruing prior to July 1, 1986, and cases pending in trial or appellate courts on January 22, 1985, in which a governmental immunity issue was properly raised and preserved, a public general hospital or medical facility is engaged in the exercise or discharge of a governmental function and thus immune from liability in tort to the extent that the diagnosis, treatment, and care of its patients were activities expressly or impliedly mandated or authorized by constitution, statute, or other law (MCL 691.1407; MSA 3.996[107]).

3. GOVERNMENTAL IMMUNITY — GOVERNMENTAL AGENCIES — PROPRIETARY FUNCTION.

Activities conducted by a governmental agency primarily for the purpose of producing a pecuniary profit and which are not normally supported by taxes or fees are proprietary functions to which governmental immunity does not apply (MCL 691.1413; MSA 3.996[113]).

4. GOVERNMENTAL IMMUNITY — PUBLIC HOSPITALS — GOVERNMENTAL AGENCIES.

A governmental agency and its agents and employees can be held liable in tort for activities arising out of the ownership or operation of a public general hospital or county medical facility where a cause of action accrues on or after July 1, 1986 (1986 PA 175, MCL 691.1407[4]; MSA 3.996[107][4]).

DISSENTING OPINION BY LEVIN, J.

5. GOVERNMENTAL IMMUNITY — PUBLIC HOSPITALS — GOVERNMENTAL AGENCIES.

*A governmental agency operating a general hospital should be subject to tort liability where the cause of action arose before July 1, 1986 (1986 PA 175, MCL 691.1401; MSA 3.996[101]).*

*Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen & Bartnick* (by *Richard E. Shaw*) for plaintiffs Hyde.

*Fieger & Fieger, P.C.* (by *Geoffrey N. Fieger*), for plaintiff Faigenbaum.

*William S. Stern, P.C.,* for plaintiff Powers.

*Kitch, Saurbier, Drutchas, Wagner & Kenney, P.C.* (by *Mark D. Willmarth* and *James D. Zazakis*), for defendant University of Michigan Board of Regents.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *George L. McCargar* and *Alan Hoffman,* Assistant Attorneys General, for defendant Oakland Medical Center.

*Cozadd, Shangle, Smith & Andrews* (by *B. Ward Smith* and *John R. Day*) for defendant Peoples Community Hospital Authority.

Amici Curiae:

*Richard M. Goodman, P.C.* (by *Susan E. Lister*), for Michigan Trial Lawyers Association.

*Sommers, Schwartz, Silver & Schwartz, P.C.* (by *Richard D. Toth*).

CAVANAGH, J. In *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567; 363 NW2d 641 (1984), this Court attempted to clarify the parameters of sovereign, governmental, and individual immunity from tort liability granted by the governmental tort liability act, MCL 691.1401 *et seq.;* MSA 3.996(101) *et seq.,* and common law. In particular, we redefined the term "governmental function," which appears in § 7 of the act, MCL 691.1407; MSA 3.996(107), as we believed the Leg-

islature intended it to be defined.[1] None of the nine consolidated cases decided in *Ross* involved the tort liability of a public general hospital, however.

In each of these cases, the plaintiffs seek to hold a public general hospital or medical facility vicariously liable for the negligent diagnosis, treatment, or care rendered by the hospital's employees or agents. Plaintiffs maintain that such hospitals can be held liable in a tort cause of action pursuant to *Parker v Highland Park,* 404 Mich 183; 273 NW2d 413 (1978). Two common questions are presented:

1) Should *Ross* be given prospective effect only or retroactive effect?

2) Did *Ross* impliedly overrule that portion of *Parker* which held that the day-to-day operation of a public general hospital is not a governmental function?

We must also decide whether, and under what circumstances, the operation of a public general hospital or medical facility constitutes a proprietary function, which is not entitled to immunity from tort liability under § 13 of the act, MCL 691.1413; MSA 3.996(113).

We hold that the rules articulated in *Ross* apply to all cases commenced after January 22, 1985, the date our opinion was issued, and to those cases pending either in trial or appellate courts on January 22, 1985, in which a governmental immunity issue was properly raised and preserved.

---

[1] Under § 7, state and local governmental agencies are immune from tort liability only when they are engaged in a governmental function:

Except as in this act otherwise provided, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function.

We further hold that to the extent that the diagnosis, treatment, and care of patients at a public general hospital or medical facility are activities which are expressly or impliedly mandated or authorized by constitution, statute, or other law, the hospital or facility is entitled to immunity from tort liability under § 7. To the extent that *Parker* held that such activities do not constitute the exercise or discharge of a governmental function, it was impliedly overruled by *Ross.* In light of 1986 PA 175, however, a governmental agency can be held liable for torts arising out of the ownership or operation of a hospital or county medical facility where the cause of action accrues on or after July 1, 1986.

Finally, we hold that only activities which are conducted primarily for the purpose of producing a pecuniary profit, *and* which are not normally supported by taxes or fees, are proprietary functions under § 13. The fact that a governmental agency produces a pecuniary profit may be evidence that the agency is engaged in a proprietary function, but it is not conclusive evidence. The focus instead should be on the primary intended purpose of the governmental activity and how the activity is normally funded.

## I. FACTS

### A. HYDE

Plaintiff Marcia Hyde was treated at the University of Michigan Hospital on July 8, 1974. On June 28, 1976, plaintiffs filed a medical malpractice suit in the Court of Claims, alleging that the hospital employees' negligent diagnoses and medical treatment caused Ms. Hyde to develop a serious postsurgical infection. Defendant Board of Regents asserted governmental immunity as an affirmative

defense in its answer. Following a pretrial conference, a pretrial summary was filed on March 30, 1977. The summary indicated that the trial court had given plaintiffs permission to amend their pleadings to allege that the injury had arisen out of the performance of a proprietary function.[2] Further proceedings apparently were held in abeyance pending this Court's decision in *Parker.*

After *Parker* was decided, defendant moved for accelerated judgment in April, 1979. Although *Parker* had held that public general hospitals are not immune from tort liability, defendant argued that this holding should not be given retroactive effect. Before a decision was rendered, this precise issue was resolved by *Murray v Beyer Memorial Hospital,* 409 Mich 217; 293 NW2d 341 (1980). *Murray* held that *Parker* was to be applied to all cases pending on December 27, 1978, in which an express challenge to governmental immunity had been made and preserved.

Plaintiffs did not file an amended complaint alleging that defendant had been engaged in a proprietary function until October 29, 1982. Defendant moved again for accelerated judgment, claiming that plaintiffs had not made or preserved an express challenge to its governmental immunity until the amended complaint was filed. Since the filing occurred long after *Parker* was decided, defendant argued that *Parker* was inapplicable. Plaintiffs countered that they had expressly challenged defendant's immunity prior to *Parker* at

---

[2] The pretrial summary contained the following statements:

PLEADINGS SATISFACTORY? No. Plaintiff is given the right to amend his pleadings to show the proprietary function of Defendant.

ARE THERE ANY DEFENSES UNDER RULE 116? Yes. Governmental immunity and statute of limitations.

the pretrial conference and the challenge had been preserved by the pretrial summary.

The trial court accepted defendant's argument and entered a judgment for defendant in an order filed February 9, 1983. A majority of the Court of Appeals affirmed.[3] Plaintiffs' application for leave to appeal was pending in this Court when *Ross* was issued. We thereafter granted leave to appeal. 424 Mich 858 (1985).

### B. FAIGENBAUM

Plaintiff is the guardian of his mother, Anita Katz. Ms. Katz has a long history of mental illness and has been hospitalized several times. On November 20, 1976, she was admitted to Clinton Valley Center, a state psychiatric facility, exhibiting abnormal twitching and movements of her mouth, face, limbs, and tongue.

In February, 1977, Ms. Katz was referred to Oakland Medical Center for a physical examination. The center was administered by the Department of Mental Health and provided general medical services to psychiatric patients. Dr. Joseph Chandler, a neurologist at the center, concluded that Ms. Katz was suffering from a degenerative nerve disease known as Huntington's chorea. Dr. Chandler prescribed Haldol for the condition. Ms. Katz had previously been treated for her mental illness with Haldol and other neuroleptic drugs, such as Thorazine, Stelazine, and Mellaril. When Ms. Katz' condition did not improve, her family insisted that the Clinton Valley Center discontinue administering any neuroleptic drugs. However, her condition did not substantially improve.

In 1979, plaintiff sued eleven doctors, two hospi-

[3] Unpublished opinion per curiam of the Court of Appeals, decided June 8, 1984 (Docket No. 69664).

tals, and three drug companies in the Wayne Circuit Court, alleging, inter alia, malpractice and products liability. A suit was also commenced in the Court of Claims against the Oakland Medical Center and Clinton Valley Center. Plaintiff alleged that the doctors had failed to diagnose and treat Ms. Katz for tardive dyskinesia, a motion disorder caused by neuroleptic drugs such as Haldol.[4] It was further alleged that a psychiatrist or neurologist should consider tardive dyskinesia as a possible diagnosis when presented with a patient exhibiting abnormal bodily movements who has a history of exposure to neuroleptic drugs. Proper treatment requires discontinuation of all neuroleptic drugs to prevent the condition from becoming permanent. Plaintiff maintained that Ms. Katz had sustained severe and permanent brain damage and irreversible motor disturbances from repeated administrations of Haldol.

The two actions were joined for trial. Clinton Valley Center was granted summary judgment on the ground of governmental immunity.[5] Several doctors employed by the center were dismissed either on governmental immunity grounds or because plaintiffs failed to show at trial that the doctors were responsible for Ms. Katz' care. A contract claim against the Oakland Medical Center was struck as being duplicative of plaintiff's tort claim. Plaintiff eventually settled with six

---

[4] Tardive dyskinesia occurs late in the course of neuroleptic drug treatment. The symptoms include protrusion and rolling of the tongue, chewing movements, smacking and pouting of the lips, opening and closing of the mouth, puffing cheeks, grimacing, eye blinking, rocking movements, choreoathetoid movements of the limbs, repeated swallowing, and respiratory dyskinesia. Persons suffering from Huntington's chorea may display similar symptoms. Ms. Katz' chief complaints were an inability to swallow, tense neck muscles, curling of the tongue, pacing and rocking, nervousness, and jerky movements.

[5] Clinton Valley Center was found to be immune from tort liability under *Perry v Kalamazoo State Hospital*, 404 Mich 205; 273 NW2d 421 (1978), because it was a state psychiatric hospital.

doctors (including Dr. Chandler), the two hospitals, and the drug companies for $378,000. The only defendant remaining at the close of proofs was Oakland Medical Center. A key issue at trial was whether the center was immune from tort liability under *Perry v Kalamazoo State Hospital,* 404 Mich 205; 273 NW2d 421 (1978), because the center treated psychiatric patients and was run by the Department of Mental Health.

On July 27, 1982, the circuit court concluded that the Oakland Medical Center could be held liable under *Parker* because it rendered only general medical care. The court also concluded that Dr. Chandler had been negligent in failing to obtain a complete medical and drug history, to consider tardive dyskinesia as a possible diagnosis, and to familiarize himself with the potential side effects of Haldol. Plaintiff was awarded $1,000,000 in damages (less settlements), $30,000 in attorney fees, and over $15,000 in expert witness and other fees.

The center's appeal was pending in the Court of Appeals when *Ross* was decided. The Court initially concluded that *Ross* should be applied to those cases pending on appeal when *Ross* was decided. Applying the new definition of "governmental function," the Court held that the center was entitled to immunity because the medical treatment rendered was expressly and impliedly authorized by the state constitution, statutes, and administrative regulations. It rejected the argument that the operation of a governmental care facility is a proprietary function because a fee is charged for medical services or an incidental profit is generated. Plaintiff's belated argument that the center could be held liable for breach of contract was rejected because plaintiff had failed to cross-appeal the dismissal of the contract count. The

judgment for plaintiff was therefore reversed. 143 Mich App 303; 373 NW2d 161 (1985). We granted plaintiff's application for leave to appeal. 424 Mich 857 (1985).

### C. POWERS

On January 10, 1981, Frank Powers was admitted to Annapolis Hospital, a public general hospital operated by defendant Peoples Community Hospital Authority (PCHA). Mr. Powers was diagnosed as suffering from a myocardial infarction. He died several days later, allegedly after his pacemaker malfunctioned.

Plaintiff, decedent's wife, filed suit in April, 1982, against the PCHA and two of its physicians, Drs. Bercu and Jahan. She alleged that the doctors and staff had failed to monitor and treat decedent's heart condition properly. Plaintiff and Dr. Bercu settled for $25,000. The PCHA was granted partial summary judgment to the extent that plaintiff sought to hold it vicariously liable for Dr. Bercu's negligence.[6]

After *Ross* was decided, the PCHA moved for summary disposition on the ground of governmental immunity.[7] An evidentiary hearing was held, primarily to determine whether Mr. Powers' death

---

[6] The PCHA and Dr. Jahan unsuccessfully moved for summary and accelerated judgment on the ground that the release executed between plaintiff and Dr. Bercu also released them of liability. The Court of Appeals denied defendants' application for leave to appeal on February 21, 1985.

[7] This was the first time that the PCHA had raised the "defense" of governmental immunity. However, the PCHA's failure to raise the issue in its first responsive pleading did not waive it. See n 35. Plaintiff's complaint, filed prior to *Ross*, contained sufficient facts to raise a governmental immunity issue, or more specifically, a lack thereof. The complaint indicated that the PCHA operated a public general hospital, which was not entitled to immunity from tort liability pursuant to *Parker*. Moreover, paragraph two alleged that the PCHA was a profit-making institution. This allegation was sufficient to invoke the statutory "proprietary function" exception.

arose during the performance of a proprietary function. The undisputed evidence showed that Annapolis Hospital charged for its medical services. It also received tax money from the twenty-four southeastern Michigan communities which participate in the PCHA. The PCHA had amassed substantial sums in its depreciation, excess revenue, and bond and interest accounts. However, none of these funds had been distributed to the state, the participating communities, or the directors and officers of the PCHA or the hospital.

Relying on *Faigenbaum,* the circuit court concluded that *Ross,* rather than *Parker,* should be applied. It found that the operation of the hospital by the PCHA constituted a governmental function because it was expressly authorized by statute. The court further concluded that under § 13 of the governmental immunity act, it had to determine whether the hospital's rendering of medical care for a fee was conducted primarily for the purpose of producing a pecuniary profit. It found that the primary purpose of the PCHA and Annapolis Hospital was to provide health care to the surrounding communities. The PCHA's motion for summary disposition was therefore granted.[8]

Plaintiff filed an application for leave to appeal with the Court of Appeals. This Court sua sponte granted leave to appeal prior to the decision of the Court of Appeals. 424 Mich 858 (1985).

## II. RETROACTIVITY OF *ROSS*

Our first task is to determine what case law is applicable in each case. Prior to *Parker,* the operation of a public general hospital was considered a governmental function under both common law and § 7 of the governmental immunity act. See

[8] The suit against Dr. Jahan is apparently still pending.

*Parker,* 404 Mich 190-191; *Martinson v Alpena,* 328 Mich 595; 44 NW2d 148 (1950); *Nicholson v Detroit,* 129 Mich 246; 88 NW 695 (1902). *Parker* rejected this well-established case law and concluded that a public general hospital can be held liable for torts committed during its day-to-day operations. Although *Parker* did not state whether its new rule of law should be given retroactive effect, the question was resolved in *Murray v Beyer Memorial Hospital:*

> [T]he rule of *Parker* is to be applied to all cases pending on December 27, 1978, in which an express challenge to the defense of governmental immunity was made and preserved as well as all cases started after that date. [409 Mich 221.]

The Court justified this limited retroactive application as follows:

> Defendant [hospital] . . . urges that *Parker v Highland Park, supra,* be applied prospectively from the date the opinion was released and not cover other cases pending on that date.
> We are satisfied that the adventitious disposition of *Parker* while we held plaintiffs' application in abeyance should not deprive plaintiffs of the benefit of the rule or make available to defendant a defense we will no longer enforce for others.
> We acknowledge that whenever a new rule of law is promulgated some unfairness to those who have relied on the old rule may be claimed. Courts, however, do not alter an established rule of law without thorough evaluation of the policy considerations involved. When the decision to overrule precedent is finally made, the Court is satisfied that the importance of the result reached outweighs any unfairness to those negatively affected by the decision. Applying the ruling prospectively with the exception of that case and cases pending on appeal in which the issue was

raised and preserved is an attempt to limit any such unfairness. [*Id.,* pp 222-223.][9]

Justice WILLIAMS further noted:

> [U]nfortunately, the state of the law as to what constitutes governmental immunity, without further legislative definition, has for some years been in flux. . . . [T]he opinions of this Court have been such as should warn those who might possibly be affected that they had better seek protection either through insurance or through legislative redefinition. [*Id.,* p 224.]

Like *Parker, Ross* did not indicate whether it should be applied retroactively. Nevertheless, the opinion repeatedly noted that the rules and definitions articulated therein are new[10] and that the judiciary has the power to redefine the term "governmental function." 420 Mich 609-610.

Plaintiffs present several reasons why *Ross* should be applied only to cases commenced after the opinion was issued. First, *Parker* clearly held that immunity from tort liability did not extend to public general hospitals. This holding has never been seriously challenged in the courts or by the Legislature. Second, there was no indication that *Ross* would overrule *Parker,* since none of the nine consolidated cases decided in *Ross* involved the immunity of a public general hospital. Finally, plaintiffs note that other decisions have been given prospective effect only. See, e.g., *Putney v Haskins,* 414 Mich 181; 324 NW2d 729 (1982); *Tebo v Havlik,* 418 Mich 350; 343 NW2d 181 (1984).

---

[9] Although *Murray* initially stated that *Parker* should be applied to all pending cases which had raised an express challenge, subsequent language referred only to cases pending on appeal. This Court did not intend to distinguish between cases pending at the trial and appellate levels for purposes of applying *Parker.* See *Scudder v Annapolis Hospital,* 129 Mich App 280, 284-286; 341 NW2d 504 (1983).

[10] 420 Mich 613, 617, 620-621, 631, 633, 635.

Similar arguments were unsuccessfully presented by public general hospitals to the *Murray* Court in an effort to limit the effect of *Parker.* Although the tort liability of public general hospitals may not have been seriously questioned after *Parker,* the definition of "governmental function" was vigorously debated. The judiciary has wrestled with this problem for over a century with little guidance from the Legislature.[11] We therefore place little reliance on plaintiffs' "legislative acquiescence" argument.

Furthermore, the consolidation of nine factually diverse cases should have signaled to the bench and bar that this Court was reevaluating the definition of "governmental function." Beginning with *Parker,* no single definition had been adopted by a majority of this Court. In addition, the case law in general was "confused [and] often irreconcilable." *Ross,* 420 Mich 596. Given the uncertainty of the law in this area, the bench and bar should have realized that some of our prior decisions, including *Parker,* might not survive after *Ross.*

Finally, the general rule is that judicial decisions are to be given complete retroactive effect. We often have limited the application of decisions which have overruled prior law or reconstrued statutes. *Tebo,* 418 Mich 360-361. Complete prospective application has generally been limited to decisions which overrule clear and uncontradicted case law. *Id.,* pp 361-363.[12]

---

[11] The Legislature has recently codified the *Ross* definition of "governmental function." See 1986 PA 175, discussed at n 16 and accompanying text.

[12] For example, in *Putney v Haskins,* this Court interpreted the "name and retain" provision of the dramshop act (MCL 436.22; MSA 18.993) as requiring the allegedly intoxicated defendant to be retained as an interested party defendant throughout an action against the dramshop defendant. 414 Mich 188. *Tebo v Havlik* held that *Putney*

We believe that *Ross* should be given the same limited retroactive effect that *Parker* was given by *Murray.* We therefore hold that the rules articulated in *Ross* should be applied to all cases commenced after the date our opinion was issued (January 22, 1985), and to those cases pending either in trial or appellate courts on that date which properly raised and preserved a governmental immunity issue.

In *Hyde,* the initial complaint was filed prior to *Parker.* The amended complaint, which alleged that the University Hospital had been engaged in a proprietary function, was filed after *Parker,* but before *Ross.* The amended complaint was filed with the trial court's permission, and defendant has never argued that the pleading should be struck. Defendant only claimed that plaintiffs' challenge to its immunity came too late to take advantage of *Parker.* Even if we were to accept defendant's argument, the fact remains that this case was pending in this Court when *Ross* was issued.[13] Since plaintiffs properly raised and preserved a challenge to defendant's immunity from tort liability in their amended complaint and subsequent appeals, plaintiffs' malpractice claim should be decided pursuant to *Ross.*

In *Faigenbaum,* plaintiff's complaint against the Oakland Medical Center was filed after *Parker*

should be applied only to cases where the settlement agreement with the allegedly intoxicated defendant was entered into after *Putney* was decided. 418 Mich 364. We refused to apply *Putney* retroactively to the statute's effective date because the Court of Appeals had clearly and consistently held that such settlements were permissible, and the bench and bar had justifiably relied upon this precedent.

[13] Since the amended complaint was properly filed prior to *Ross,* we need not decide whether plaintiffs' oral assertion of the "proprietary function" exception at or before the pretrial conference, coupled with defendant's knowledge thereof and the trial court's permission to amend the complaint, also constituted an "express challenge" to defendant's immunity.

was decided. The center unsuccessfully argued that it was engaged in a governmental function under *Perry.* The center's appeal was pending in the Court of Appeals when *Ross* was decided. Since the center properly raised a governmental immunity issue in that appeal, the Court of Appeals correctly concluded that the case should be decided pursuant to *Ross.*

In *Powers,* plaintiff's malpractice claim was filed after *Parker* was decided. *Ross* was issued while the case was still pending in circuit court. The court correctly concluded that plaintiff's claim should be decided pursuant to *Ross.*

### III. VIABILITY OF *PARKER* AFTER *ROSS*

Our second task is to determine whether *Ross* impliedly overruled *Parker'*s holding that the operation of a public general hospital is not a governmental function under § 7 of the governmental immunity act.

Three opinions were written in *Parker,* each adopting a different definition of "governmental function." Justice FITZGERALD, joined by Chief Justice KAVANAGH and Justice LEVIN, adopted the narrow "of essence to government" test, i.e., the activity must be of such a peculiar nature that it can only be performed by government. Justice FITZGERALD concluded that the operation of a hospital is essentially a business, regardless of who operates it. Therefore, a governmental agency which decides to engage in such activities should not be entitled to immunity from tort liability. 404 Mich 194-195.

Justice MOODY concurred, but applied the broader "essence of governing" test, i.e., the activity must be one which can be effectively accomplished only by government. Noting the large

number of private general hospitals and the governmental agency's lack of direct involvement in a hospital's day-to-day operations, Justice MOODY concluded that public general hospitals are not entitled to immunity. *Id.,* pp 200-202.

Justice RYAN, joined by Justices WILLIAMS and COLEMAN, dissented. Applying the "common good of all" test, Justice RYAN concluded that the examination, diagnosis, and treatment of patients are activities entitled to immunity because they promote the general public health. *Id.,* pp 203-204.

None of the cases decided in *Ross* involved the tort liability of a public general hospital. However, *Ross* explicitly rejected each of the definitions of "governmental function" used in *Parker.* 420 Mich 614-619. "Governmental function" was redefined as

an activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law. [*Id.,* p 620.]

We noted that this definition "is broad and encompasses most of the activities undertaken by governmental agencies." *Id.,* p 621.

Under *Ross,* a public general hospital or medical facility is engaged in the exercise or discharge of a governmental function whenever its activities are expressly or impliedly mandated or authorized by constitution, statute, or other law. To the extent that *Parker* held that such activities do not constitute a governmental function, *Parker* was impliedly overruled by *Ross.*[14]

[14] Plaintiffs note that earlier in the *Ross* opinion, this Court declined to overrule "this aspect of *Parker.*" Plaintiffs maintain that the aspect of *Parker* we intended to affirm was its holding that public general hospitals are not immune from tort liability. This argument ignores the context in which the statement was made. The immediately preceding discussion focused on whether this Court has the

Plaintiffs vehemently argue that it is "unjust" to overrule *Parker* and deny an injured person the right to recover damages merely because he sought medical care from a public hospital.[15] We are not unsympathetic to these arguments. However, the parameters of sovereign and governmental immunity are governed by statute. Our duty is to interpret the statutory language in the manner intended by the Legislature which enacted § 7 in 1964 and amended it in 1970.

> "The controlling test as to the meaning of a statutory provision is always the legislative intent when fairly ascertainable. But the 'intent' referred to is the one entertained by the legislature at the time of the passage of the act, and not the intent expressed by a subsequent amendment. In the instant case, to interpret the subsequent amendment as an indication of the legislature's original intent would be mere speculation, not judicial construction." [*Detroit Edison Co v Dep't of Revenue*, 320 Mich 506, 519; 31 NW2d 809 (1948).]

See also *People v Gilbert,* 414 Mich 191, 200; 324 NW2d 834 (1982).

The governmental immunity act was passed in 1964 to halt this Court's attempts to abolish sovereign and governmental immunity. See *Ross,* pp 603-606. In both 1964 and 1970, the operation of a public general hospital was considered a governmental function. *Parker,* 404 Mich 190-191. There is no indication, either in the words of the act or

power to redefine "governmental function," or is bound by the prior common-law definition. We noted that a majority of the *Parker* Court had concluded that this Court could redefine the term. *Id.,* pp 609-610. We intended to affirm only this "aspect" of *Parker.*

[15] Plaintiffs raise several equal protection and due process arguments. We do not decide these questions because they were not raised in, or decided by, the lower courts. *Ross* noted, however, that the Legislature's disparate treatment of public and private tortfeasors is not totally unjustifiable. *Id.,* pp 618-619.

the legislative history, that these Legislatures intended to abrogate a public general hospital's immunity from tort liability. As noted in *Ross:*

> The consensus which our efforts produce today should not be viewed as this Court's individual or collective determinations of what would be most fair or just or the best public policy. The consensus does reflect, however, what we believe the Legislature intended the law to be in this area. [*Id.,* p 596.]

We suggested in *Ross* that plaintiffs' arguments would be better addressed to the Legislature. *Id.,* p 621. In response to *Ross,* 1986 PA 175 was enacted, effective July 1, 1986. The *Ross* definition of "governmental function" is codified in § 1(f).[16] However, § 7(4) specifically allows tort liability to be imposed on a governmental agency which owns or operates a public general hospital or county medical facility.[17] By adopting this narrow exception to the

[16] MCL 691.1401(f); MSA 3.996(101)(f) provides:

"Governmental function" is an activity which is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law.

[17] MCL 691.1407(4); MSA 3.996(107)(4) provides:

This act does not grant immunity to a governmental agency with respect to the ownership or operation of a hospital or county medical care facility or to the agents or employees of such hospital or county medical care facility. As used in this subsection:
(a) "County medical care facility" means that term as defined in section 20104 of the public health code, Act No. 368 of the Public Acts of 1978, being section 333.20104 of the Michigan Compiled Laws.
(b) "Hospital" means a facility offering inpatient, overnight care, and services for observation, diagnosis, and active treatment of an individual with a medical, surgical, obstetric, chronic, or rehabilitative condition requiring the daily direction or supervision of a physician. The term does not include a hospital owned or operated by the department of mental health or a hospital operated by the department of corrections.

broad immunity granted by *Ross* and codified by 1986 PA 175, it is clear that the Legislature believed that *Ross* had impliedly overruled *Parker.*

In light of this recent legislative activity, today's holding will have limited effect. Sovereign or governmental immunity from tort liability will be extended to a governmental agency operating a public general hospital or medical facility only in those cases involving a cause of action accruing prior to July 1, 1986, which was pending on January 22, 1985, or commenced on or after that date.[18] Where the cause of action accrues on or after July 1, 1986, a governmental agency may be held liable for torts arising out of the ownership or operation of a hospital or county medical facility.

### IV. APPLICATION OF *ROSS*

In each case, plaintiffs seek to hold the defendant vicariously liable for the negligence of its employees or agents. Vicarious tort liability can only be imposed upon a governmental agency where:

1) the employee or agent committed a tort while acting during the course of employment and within the scope of his authority, and

2) the employee or agent committed the tort while engaged in an activity which was nongovernmental or proprietary or which fell within an

1986 PA 175 also modifies the tests for individual immunity from tort liability articulated in *Ross.*

[18] Even though a plaintiff is unable to recover directly from a governmental agency on a tort cause of action arising prior to July 1, 1986, this does not necessarily mean that he is without a remedy. A plaintiff may be able to allege a nontort claim or a cause of action falling within one of the exceptions to the governmental immunity act. See *Ross,* pp 647-648. Furthermore, the plaintiff can recover from the individual tortfeasor who caused the injury in certain circumstances. *Id.,* pp 633-634. Plaintiff may ultimately be paid by a governmental agency if the agency has agreed to indemnify its officers, employees, or agents. *Id.,* p 635; MCL 691.1408; MSA 3.996(108).

exception to the governmental immunity act. *Ross,* pp 623-625.

There is no suggestion that the employees or agents in each case were acting outside the course of employment or scope of authority when the alleged torts were committed. Other than the "proprietary function" exception, plaintiffs have not alleged that any other exception is applicable. We first decide whether the diagnosis, treatment, and care rendered by each hospital, through its employees and agents, constituted the exercise or discharge of a governmental function.

### *HYDE*

Plaintiffs alleged that the employees of the University Hospital negligently diagnosed and treated Ms. Hyde's fracture. The question is whether the diagnosis and treatment of patients were activities which were expressly or impliedly mandated or authorized by constitution, statute, or other law.

The University of Michigan is statutorily required to maintain a department of medicine. MCL 390.8; MSA 15.908. The Legislature expressly authorized the construction and operation of the University Hospital through several appropriation acts.[19] The operation of a hospital implicitly includes the diagnosis and treatment of patients. Since these activities were implicitly authorized by statute, the employees were engaged in the exercise or discharge of a governmental function when the alleged tort was committed.

### *FAIGENBAUM*

Plaintiff argues that the operation of defendant

---

[19] See, e.g., 1917 PA 96; 1919 PA 178; 1921 PA 351; 1923 PA 310. For further information on the University Hospital, see Shaw, *University of Michigan: An Encyclopedic Survey* (Ann Arbor: U of M Press, 1951).

Oakland Medical Center by the Department of Mental Health was an unauthorized, ultra vires activity. Thus, any diagnosis and treatment rendered to Ms. Katz as part of the center's general medical operations did not constitute the exercise or discharge of a governmental function. To evaluate this argument fully, the history and purpose of the center must be detailed.

Oakland Medical Center at all times was operated by the DMH. The center was established in 1968 as the medical-surgical unit of the Clinton Valley Center (then the Pontiac State Hospital). It became a separate administrative unit within the DMH in 1971. The center was created because local medical facilities were reluctant to render medical treatment to mentally ill and developmentally disabled persons residing in state facilities. The center rendered medical treatment primarily to patients from Clinton Valley Center, other state psychiatric facilities, and centers for the developmentally disabled.[20] By 1978, several community hospitals had contracted with the DMH to provide medical and surgical services to mentally ill and developmentally disabled patients. The Oakland Medical Center thereafter discontinued operations.

Plaintiff argues that there is no constitutional or statutory authority which permitted the DMH to establish and operate a general medical care facility. Plaintiff believes that the Court of Appeals incorrectly relied upon § 116 of the Mental Health Code, MCL 330.1116; MSA 14.800(116). That stat-

---

[20] On occasion, state prison inmates were treated at the Oakland Medical Center. Emergency care was also rendered to employees of the Clinton Valley Center, but this occurred very infrequently. These facts are not relevant to our determination of whether the DMH was authorized to establish and operate the medical center. We need not decide whether the center was authorized to treat inmates and employees, since the center was authorized to treat patients of mental health facilities, such as Ms. Katz.

.

ute allegedly permits the DMH to function only in areas concerning mental health.

We do not interpret the DMH's powers so narrowly. The Legislature expressly authorized the creation and operation of a general medical-surgical unit within the DMH through several appropriations acts. See, e.g., 1967 PA 32; 1971 PA 126. The latter act specifically noted:

> The goal of the medical services component [program] is to restore and maintain the physical well-being of the hospital patient population by providing diagnostic, laboratory, medical, surgical, dental services and specialized nursing care for infirm patients.

Each resident of a mental health facility must be given a comprehensive physical and mental examination prior to, or soon after, admission and must be reexamined at least annually. MCL 330.1710; MSA 14.800(710). Recipients of mental health services are entitled to "basic human dignity" under MCL 330.1704(3); MSA 14.800(704)(3), which would include the right to prompt and adequate general medical care. Even if these statutes did not exist, the care and treatment of persons residing in state mental health facilities include an implied responsibility to protect both the residents' physical and mental well-being. See *Ross,* pp 641, 643. The DMH was ultimately responsible for ensuring that Ms. Katz received necessary treatment for both her physical and mental conditions.

There is nothing in § 116 of the Mental Health Code which would prevent the DMH from fulfilling its statutory duties by operating a general medical care facility for mentally handicapped patients. Section 116 provides in pertinent part:

Pursuant to section 51 of article 4 of the constitution of 1963, which declares that the health of the people of the state is a matter of primary public concern; and pursuant to section 8 of article 8 of the constitution of 1963, which declares that services for the care, treatment, or rehabilitation of those who are seriously mentally handicapped shall always be fostered and supported; the department shall continually and diligently endeavor to ensure that adequate and appropriate mental health services are available to all citizens throughout the state. To this end the department shall have the following general powers and duties:

(a) It may function in the areas of mental illness, mental retardation, organic brain and other neurological impairment or disease, alcoholism, and substance abuse. Priority shall be given to the areas of mental illness and mental retardation. Within the area of mental illness priority shall be given to the more severe forms of such disability.

(b) It may provide, on a residential or nonresidential basis, any type of patient or client service including but not limited to prevention, diagnosis, treatment, care, education, training, and rehabilitation.

\*    \*    \*

(d) It may operate directly or through contractual arrangement such facilities as are necessary or appropriate.

\*    \*    \*

(j) It may enter into any agreement, contract, or arrangement with any public or nonpublic entity that is necessary or appropriate to fulfill those duties or exercise those powers that have by statute been given to the department.

\*    \*    \*

(l) It shall have such powers as are necessary or appropriate to fulfill those duties and exercise those powers that have by statute been given to the department and which are not otherwise prohibited by law.

Subsection (a) specifically permits the DMH to function in areas of organic brain disease and neurological impairment. (Ms. Katz was referred to the Oakland Medical Center because her treating psychiatrists suspected neurological problems.) Subsection (b) authorizes the DMH to provide *any* type of patient service, including diagnosis, treatment, and care. There is no requirement that the services must be related solely to the patient's mental health. The DMH can provide these services directly, or through contractual arrangement under subsections (d) and (j). Defendant Oakland Medical Center was created because the DMH was unable to provide sufficient medical and surgical services on a contractual basis.

We conclude that the DMH was expressly and impliedly mandated by statute to secure, in some manner, those general medical services necessary for Ms. Katz's physical well-being. The DMH was expressly authorized by statute to provide such services directly through the Oakland Medical Center. The operation of a general medical facility implicitly includes the diagnosis and treatment of patients. Therefore, the employees of defendant center were engaged in the exercise or discharge of a governmental function when the malpractice occurred.

### *POWERS*

Plaintiff initially argues that Annapolis Hospital is not entitled to immunity from tort liability because it is not a "governmental agency." Section 1(d) of the governmental immunity act, MCL 691.1401(d); MSA 3.996(101)(d), defines "governmental agency" as "the state, political subdivisions, and municipal corporations." These terms are also defined in § 1:

(a) "Municipal corporation" means any city, village, township or charter township, or any combination thereof, when acting jointly.

(b) "Political subdivision" means any municipal corporation, county, township, charter township, school district, port district, or metropolitan district, or any combination thereof, when acting jointly, and any district or authority formed by 1 or more political subdivisions.

(c) "State" means the state of Michigan and its agencies, departments, and commissions, and shall include every public university and college of the state, whether established as a constitutional corporation or otherwise.

Although hospitals are not listed in these definitions, plaintiff has overlooked the entity she actually sued. Plaintiff properly sued the Peoples Community Hospital Authority, an entity formed by twenty-four southeastern Michigan communities, which runs five community hospitals, including Annapolis Hospital. An authority formed by one or more political subdivisions is included within § 1(b)'s definition of "political subdivision."[21]

Plaintiff also argues that there is no statute or other law authorizing or mandating the specific types of routine medical care provided by public general hospitals. Plaintiff has misperceived how the *Ross* definition of "governmental function"

---

[21] Similarly, in *Hyde,* plaintiffs sued the Board of Regents of the University of Michigan, the entity specifically empowered to be sued under MCL 390.4; MSA 15.904. Public universities are included within § 1(c)'s definition of "state."

In *Faigenbaum,* plaintiff sued the Oakland Medical and Clinton Valley Centers, but not the DMH. However, the DMH was the department responsible for running the Oakland Medical Center and will ultimately pay any judgment entered, especially since the center is no longer in existence. The governmental immunity act cannot be circumvented merely by naming a facility as the defendant, rather than the state or local governmental agency which operates the facility. Since a department of the state is included within § 1(c)'s definition of "state," the governmental immunity act is applicable.

should be applied. It is not necessary that there be a specific statutory provision mandating or authorizing a hospital to set bones or deliver babies. Such an interpretation would emasculate the governmental immunity act and *Ross,* as well as result in a proliferation of unnecessarily detailed legislation. *Ross* only requires that there be some constitutional, statutory, or other legal basis for the activity in which the governmental agency was engaged when the alleged tort was committed. The governmental immunity act, as interpreted by *Ross,* permits imposition of tort liability upon a governmental agency only where the agency was engaged in an ultra vires activity, i.e., an activity which is not expressly or impliedly mandated or authorized by constitution, statute, or other law. *Ross,* p 620.

We conclude that the care and treatment of patients by Annapolis Hospital were expressly authorized by statute. Defendant authority was established pursuant to the joint hospital authority act, MCL 331.1 *et seq.;* MSA 5.2456(1) *et seq.* This act authorizes two or more cities, townships, and villages to incorporate a hospital authority in order to construct, own, and operate one or more community hospitals. "Hospital" is specifically defined in the act as a building, structure, or related facility "intended for, incidental, or ancillary to the care of the sick or wounded, or for the care of persons requiring medical treatment . . . ." MCL 331.1(2); MSA 5.2456(1)(2). The employees and agents of Annapolis Hospital were therefore engaged in the exercise or discharge of a governmental function when the alleged torts occurred.

## V. "PROPRIETARY FUNCTION" EXCEPTION

Although the employees and agents in each case

were engaged in the exercise or discharge of a governmental function when they allegedly committed a tort, this does not mean that defendants are automatically entitled to immunity from tort liability. It must also be determined whether the activity at issue constituted the performance of a proprietary function. See *Ross,* p 613. If so, defendants can be held vicariously liable under § 13 of the governmental immunity act:

> The immunity of the state shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as herein defined. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the state, excluding, however, any activity normally supported by taxes or fees. No action shall be brought against the state for injury or property damage arising out of the operation of proprietary function, except for injury or loss suffered on or after July 1, 1965. [MCL 691.1413; MSA 3.996(113).][22]

Although § 13 only refers to the state, *Ross* judicially extended the statutory definition of "proprietary function" to nonsovereign governmental agencies. *Id.,* pp 613-614. Thus, the following discussion of the "proprietary function" exception applies to all state and local governmental agencies.

In each case, plaintiffs maintain that the hospital or medical facility was performing a proprietary function because it charged a fee for the diagnosis, treatment, and care rendered to its patients. In *Hyde,* plaintiffs raised this allegation

---

[22] 1986 PA 175 amended § 13 only insofar as "governmental agency" was substituted for "state" throughout the section. Thus, the subsequent discussion will apply equally to cases decided under the amended version of § 13.

in their amended complaint. However, the lower courts have never passed upon the merits of this allegation. Nor is the record complete enough to permit full review of this claim.

In *Faigenbaum,* the "proprietary function" exception was not raised until after *Ross* was decided and shortly before oral arguments were held by the Court of Appeals. That Court held, apparently as a matter of law, that the operation of a governmental care facility cannot be deemed a "proprietary function," even where the facility charges for its services and produces an incidental profit. 143 Mich App 313-314. However, this precise issue was not fully litigated at trial.

*Powers* is the only case in which a full evidentiary hearing has been conducted, and findings of fact and law made, as to whether the diagnosis, treatment, and care of patients at Annapolis Hospital constituted a proprietary function. We therefore begin our analysis of the "proprietary function" exception with a summary of the undisputed evidence presented in *Powers.*

Defendant PCHA was organized in 1945 to provide medical services to the rapidly growing western Wayne County communities. The PCHA currently operates five community hospitals, which serve approximately 250,000 patients annually. The number of participating communities has grown from nine to twenty-four. Each community levies an assessment on its residents to redeem construction bonds. In return, the residents are charged a lower fee for medical services than that charged to nonresident patients. Most of the PCHA's revenue is generated from fees charged for medical services rendered.

The PCHA actively competes with other health care providers for both resident and nonresident patients. In response to changing medical needs of

the communities and competition from private health care providers, the PCHA has created an HMO-type health plan, built outpatient health care facilities, and entered into contractual arrangements with non-PCHA hospitals and local employers to gain more patients. Currently, the PCHA is a well-managed and fiscally sound governmental agency. As of June 30, 1983, the PCHA had $9.9 million in its operation, maintenance, and receiving fund; over $30 million in its depreciation (capital expenditures) fund; and $8.3 million in its bond and interest redemption fund.[23] In addition, the revenue over expense account contained over $5.5 million as of June 30, 1983, and $8.4 million as of June 30, 1984.[24] The PCHA has never distributed excess revenues to the state, participating communities, or its board of directors.

The trial court found that § 13 of the governmental immunity act contains two tests: 1) was the activity in question conducted primarily for the purpose of producing a pecuniary profit, and 2) was the activity supported by taxes or fees? The court concluded that even though the PCHA had excess revenues, it did not operate its hospitals primarily to produce a pecuniary profit. Rather, the history of the PCHA clearly indicated that it

[23] The PCHA was required by federal and state statutes and regulations to maintain a certain level of reserves in several accounts. The depreciation fund was used to finance capital expenditures, such as the purchase of new medical equipment and building renovations. A state moratorium on certain expenditures had resulted in a particularly high amount in the depreciation account. The assessments levied by participating communities were deposited only into the bond and interest account. Since the assessments never fully covered the bond and interest payments, money was withdrawn from certain other accounts when necessary. Two members of the PCHA board of directors testified that the PCHA could survive without the tax assessments.

[24] The parties vigorously debated whether the amount in the revenue over expense account was "profit," since the PCHA and its hospitals were nonprofit organizations and had never distributed these funds in the form of dividends.

was established to provide hospital and medical care to the participating communities. The court noted that the excess revenues were channeled into other accounts when necessary and were used solely to operate the hospitals. The fact that the PCHA actively competed with other health care providers went more to Justice MOODY's "essence of governing" test, which the court believed was "ostensibly overruled" by *Ross.* The court also noted that the PCHA was funded in part by taxes. Summary disposition was granted to the PCHA because the operation of the hospitals was a governmental, nonproprietary function.

The trial court correctly interpreted § 13. Prior to the enactment of the governmental immunity act, decisions of this Court had differed as to how much, if any, incidental profit could be generated before an activity was deemed to be a proprietary function.[25] However, the Legislature has specifically defined "proprietary function" in § 13 of the act:

> Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the state,[26] excluding, however, any activity normally supported by taxes or fees.

Unlike the definition of "governmental function," the definition of "proprietary function" is quite specific and needs no interpretation. Before

---

[25] See Cooperrider, *The Court, the Legislature, and governmental tort liability in Michigan,* 72 Mich L R 187, 229-237 (1973), and cases discussed therein.

[26] In cases involving nonsovereign governmental agencies, an activity conducted primarily to produce a pecuniary profit for the governmental agency, rather than the state, could be deemed a proprietary function. This interpretation is consistent with the recent amendments to § 13. See n 22.

an activity is deemed a proprietary function, it must satisfy two tests:

1) The activity must be conducted primarily for the purpose of producing a pecuniary profit, *and*

2) The activity cannot normally be supported by taxes or fees.

There is nothing in § 13 which requires that the activity actually generate a profit before it can be deemed a proprietary function. If the availability of immunity turned solely upon an examination of the ledgers and budgets of a particular activity, a fiscally responsible governmental agency would be "rewarded" with tort liability for its sound management decisions. Such a rule could discourage implementation of cost-efficient measures and encourage deficit spending. Moreover, the rule would be difficult to implement and inconsistent in its results. If an activity operates at a loss one year, but makes a profit the next year, does the availability of immunity from tort liability also change? If one of the hospitals operated by the PCHA consistently operates at a loss, would immunity be granted to that hospital, but not the other fiscally sound hospitals?

The existence of a profit is not an irrelevant consideration, however. The fact that a governmental agency pursues an activity despite consistent losses may be evidence that the primary purpose is not to make a pecuniary profit,[27] but it is not conclusive evidence.[28] Conversely, the fact that the activity consistently generates a profit may evidence an intent to produce a profit. However, § 13 permits imposition of tort liability only

---

[27] See *Joe Davis v Detroit*, 98 Mich App 705, 711; 296 NW2d 341 (1980), lv den 422 Mich 892 (1985); *Smith v Huron-Clinton Metropolitan Authority Bd of Comm'rs*, 49 Mich App 280, 283; 212 NW2d 32 (1973).

[28] See *Knapp v Dearborn*, 60 Mich App 18, 25; 230 NW2d 293 (1975).

where the *primary* purpose is to produce a pecuniary profit. It does not penalize a governmental agency's legitimate desire to conduct an activity on a self-sustaining basis.

Another relevant consideration is where the profit generated by the activity is deposited and how it is spent. If the profit is deposited in the governmental agency's general fund or used to finance unrelated functions, this could indicate that the activity at issue was intended to be a general revenue-raising device.[29] If the revenue is used only to pay current and long-range expenses involved in operating the activity, this could indicate that the primary purpose of the activity was not to produce a pecuniary profit.[30]

The trial court concluded that the PCHA's primary purpose in operating its hospitals was to provide hospital and medical care to area residents. In light of all the evidence presented, this finding is not clearly erroneous.[31] Even if the funds accumulated in the revenue over expense account are deemed "profit," this is not conclusive evidence that the PCHA's primary purpose was to produce a pecuniary profit. The excess revenues were not distributed to the state, the participating communities, or members of the PCHA. If other accounts were insufficient to meet current expenses, funds were withdrawn from the revenue over expense account. Thus, the first test of § 13 was not satisfied.

Even if we were to conclude that the PCHA's primary purpose was to produce a pecuniary profit, the operation of the hospitals was in fact

[29] For example, the net revenue generated by the state lottery is deposited into the state school aid fund. MCL 432.41; MSA 18.969(41).

[30] See *Davis, supra.*

[31] A similar conclusion was reached in *Bullinger v Gremore,* 343 Mich 516, 559; 72 NW2d 777 (1955).

financed primarily by fees charged for medical services rendered and, to a lesser extent, taxes levied by participating communities.[32] Thus, the second test of § 13 was not satisfied. The trial court properly granted defendant PCHA's motion for summary disposition.[33]

The Legislature has defined "proprietary function" in a very narrow, unambiguous manner. The focus is on the primary intended purpose of the activity and how the activity is normally funded. A plaintiff who merely alleges that a governmental agency provides goods or services for a fee has not sufficiently alleged that the agency is engaged in a proprietary function. Often, an agency is required by statute or other law to charge a fee for its goods and services.[34] Instead, the plaintiff must allege that the primary purpose of the activity is to produce a pecuniary profit *and* that the activity is not normally supported by taxes or fees.

In *Hyde,* ¶ 5 of plaintiffs' amended complaint stated

---

[32] Section 13 does not require that the activity actually be supported by taxes or fees to be immune from tort liability. The activity need only be one which is *normally* supported by taxes or fees.

[33] Plaintiff notes that the operation of Beyer Hospital by the PCHA was deemed a proprietary function in *Lykins v Peoples Community Hospital,* 355 F Supp 52 (ED Mich, 1973). In light of *Ross* and the instant cases, much of the reasoning used in *Lykins* is no longer valid. The *Lykins* court believed that all activities of state agencies are either governmental or proprietary. This strict dichotomy was rejected in *Ross,* p 613 and n 32. Although *Lykins* was decided well before *Parker,* the court essentially adopted the stricter "essence to governing" test in determining that the operation of a general hospital by a governmental agency is not a governmental function. *Ross* rejected this test. Finally, the court did not analyze or apply § 13's definition of "proprietary function."

[34] For example, the PCHA is statutorily required to charge sufficient rates to cover the reasonable cost and value of its services. MCL 331.8i; MSA 5.2456(8i). See also MCL 331.160; MSA 14.1139 (every person who is not a pauper shall pay reasonable compensation to county public hospitals for services rendered); MCL 330.1800 *et seq.;* MSA 14.800(800) *et seq.* (every recipient of mental health services who is able to pay must reimburse the DMH for services received).

[t]hat the Plaintiff paid valuable consideration for the medical services rendered to her and therefore the Defendants were engaged in a proprietary function by viture [sic] of the fact that there are health care providers in the private sector of society who render the same sort of services.

Plaintiffs bear the burden of pleading facts in their complaint which would justify a finding that recovery in their tort cause of action is not barred by the governmental immunity act. *Ross,* p 621, n 34; *Galli v Kirkeby,* 398 Mich 527, 532, 540-541; 248 NW2d 149 (1976).[35] Paragraph 5 of the plaintiffs' amended complaint merely alleges that plaintiffs paid the University Hospital for medical services which are routinely provided by private medical facilities. Plaintiffs did not allege that the diagnosis, treatment, and care of patients at the hospital was primarily intended to produce a pecuniary profit for the state, and that this activity was not normally supported by taxes or fees. Plaintiffs' amended complaint failed, as a matter of law, to state a tort cause of action which falls within § 13's "proprietary function" exception.

In *Faigenbaum,* plaintiff did not allege in his Court of Claims complaint that the Oakland Medical Center was engaged in a proprietary function when the malpractice occurred. Nor was this issue litigated. Plaintiff first raised the argument in his supplemental brief filed with the Court of Appeals shortly after *Ross* was decided. We will not consider this untimely and unpreserved argument. See *Swartz v Dow Chemical Co,* 414 Mich 433, 446; 326 NW2d 804 (1982).

Plaintiff also asks that his contract claim

---

[35] Unlike other claims of immunity, sovereign and governmental immunity are not affirmative defenses, but characteristics of government which prevent imposition of tort liability. *Ross, supra; Galli,* p 541, n 5; *McCann v Michigan,* 398 Mich 65, 77, n 1; 247 NW2d 521 (1976). Compare MCR 2.111(F)(3)(a).

against the Oakland Medical Center be reinstated. Prior to trial, the circuit court struck Count II of plaintiff's complaint, and denied his motions for reconsideration, because the contract claim was supposedly duplicative of the tort claim. Plaintiff did not appeal any of these decisions, or raise the contract claim via a cross-appeal. The issue was raised before the Court of Appeals in plaintiff's supplemental brief filed after *Ross* was decided. The Court refused to consider the issue because it had not been properly appealed.

The fact that substantially identical facts underlie a plaintiff's tort and nontort causes of action does not automatically render them duplicative. *Ross*, pp 647-648. The trial court should have instead determined whether plaintiff had properly pleaded and could prove the elements of a breach of contract claim. Although we do not condone plaintiff's failure to appeal this issue in a proper manner, we remand this case to the trial court for a determination on this issue. Plaintiff raised the contract claim in his complaint and its viability will determine the outcome of this litigation. *Swartz, supra.*

### VI. CONCLUSION

In *Hyde,* the decision of the Court of Appeals is affirmed on different grounds.

In *Faigenbaum,* the decision of the Court of Appeals is affirmed insofar as it held that *Ross* is to be given limited retroactive effect, and that *Parker* was impliedly overruled by *Ross.* The case is remanded to the Wayne Circuit Court for further proceedings on plaintiff's breach of contract claim. We do not retain jurisdiction.

In *Powers,* the decision of the Wayne Circuit Court is affirmed.

WILLIAMS, C.J., and BRICKLEY, BOYLE, and RILEY, JJ., concurred with CAVANAGH, J.

LEVIN, J. (*dissenting*). In 1978, this Court ruled, in *Parker v Highland Park,* 404 Mich 183; 273 NW2d 413 (1978), that the operation of a general hospital was not a "governmental function" within the meaning of the governmental tort liability act.[1]

Six years later, in *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567; 363 NW2d 641 (1984), this Court ruled that the construction of a drain, operations of a juvenile-care facility by the Department of Social Services, operations of facilities for emotionally disturbed persons by the Department of Mental Health, operations of a school district, the issuance of dredging permits by the Department of Natural Resources, the police response to a disturbance, and operations of a 911 system, were governmental functions.[2] In so ruling, this Court defined "governmental function" as

[1] MCL 691.1401; MSA 3.996(101).

[2] 1. *Ross, supra,* p 637. The Court posed the issue as involving "only the direct liability of a nonsovereign governmental agency [district and drain commissioner] for its negligence in contracting out, supervising, and inspecting the construction of a drain."

2. *Ross, supra,* p 640 (*Willis v Dep't of Social Services*). The Court said "[t]he question therefore is whether allowing decedent to participate in a swimming outing, and the care and supervision of decedent during the outing [with the juvenile care facility], constitute the exercise or discharge of a nonproprietary, governmental function."

3. *Ross, supra,* pp 642-643 (*Siener v Dep't of Mental Health*). "We must therefore determine whether the control and supervision of emotionally disturbed patients by [the Department of Mental Health in the Hawthorn Center] and their employees during a field trip is expressly or impliedly mandated or authorized by constitution, statute, or other law."

4. *Ross, supra,* p 646 (*Rocco v Dep't of Mental Health*). The Court said the crucial inquiry was "whether the placement of patients within a mental health facility, and the care, control, and supervision of in-patients, are activities which are expressly or impliedly mandated or authorized by constitution, statute, or other law."

5. *Ross, supra,* p 649 (*Regulski v Murphy*). The Court said it was required to "determine whether the instruction and supervision of students enrolled in a building trades class, as well as the provision of

"an activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law . . . ."[3]

In two of these cases, consolidated on appeal, it was held, after *Ross* was decided, that because the operation of a general hospital is an activity that the defendant governmental entities were authorized by law to engage in, they were, pursuant to *Ross,* immune from tort liability.[4]

After argument in this Court, the governmental tort liability act was amended by 1986 PA 175. There was added, for the first time, a definition of

safety devices and measures, constitute the exercise or discharge of a nonproprietary, governmental function."

6. *Ross, supra,* p 653 (*Trezzi v Detroit*). The Court said: "We therefore must determine whether the categorizing of emergency calls by a 911 operator and the dispatch of police vehicles in accordance therewith are activities which are expressly or impliedly mandated or authorized by constitution, statute, or other law."

7. *Ross, supra,* p 655 (*Disappearing Lakes Ass'n v Dep't of Natural Resources*). The Court inquired "whether the issuance of dredging permits and extensions, and activities related thereto, are activities which are expressly or impliedly mandated or authorized by constitution, statute, or other law."

8. *Ross, supra,* p 660 (*Zavala v Zinser*). "[W]e must determine whether [a police] officer's decision to request and await backup assistance is expressly or impliedly mandated or authorized by constitution, statute, or other law."

[3] *Ross, supra,* p 620.

[4] *Faigenbaum v Oakland Medical Center,* 143 Mich App 303; 373 NW2d 161 (1985).

In *Powers v Peoples Community Hospital Authority,* the circuit court concluded, on the basis of *Ross,* that the operation of a general hospital was a governmental function. This Court granted leave to appeal prior to decision of the Court of Appeals. 424 Mich 858 (1985).

In *Hyde v Michigan* (not officially reported), a divided Court of Appeals ruled that *Parker v Highland Park, supra,* did not apply because this Court had subsequently held in *Murray v Beyer Memorial Hospital,* 409 Mich 217, 221; 293 NW2d 341 (1980), that "the rule of *Parker* is to be applied to all cases pending on December 27, 1978, in which an express challenge to the defense of governmental immunity was made and preserved as well as all cases started after that date," and, in the view of the majority, the plaintiff had not made and preserved an express challenge to the defense of governmental immunity. The Court's disposition makes it unnecessary to express an opinion whether *Hyde* was correctly decided by the Court of Appeals.

governmental function. Act 175 adopted the *Ross* definition of governmental function but stated that immunity from tort liability was not granted with respect to the ownership or operation of a hospital except a hospital owned by the Department of Mental Health or the Department of Corrections. The amendments are effective as to causes of action arising on and after July 1, 1986. The amendatory language, in pertinent part, is as follows:

Sec. 1. As used in this act:

\* \* \*

(f) *"Governmental function" is an activity which is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law.*

\* \* \*

Sec. 7.

\* \* \*

(4) *This act does not grant immunity to a governmental agency with respect to the ownership or operation of a hospital* or county medical care facility or to the agents or employees of such hospital or county medical care facility. As used in this subsection:

(a) "County medical care facility" means that term as defined in section 20104 of the public health code, Act No. 368 of the Public Acts of 1978, being section 333.20104 of the Michigan Compiled Laws.

(b) "Hospital" means a facility offering inpatient, overnight care, and services for observation, diagnosis, and active treatment of an individual with a medical, surgical, obstetric, chronic, or rehabilitative condition requiring the daily direction or supervision of a physician. The term does not include a hospital owned or operated by the department of mental health or a hospital operated by the department of corrections.

* * *

Section 2. This amendatory act *shall take effect July 1, 1986.*

Section 3. (1) *Sections 1, 7,* and 13 of Act No. 170 of the Public Acts of 1964, as amended by this amendatory act, being sections 691.1401, 691.1407, and 691.1413 of the Michigan Compiled Laws, *shall not apply to causes of action which arise before July 1, 1986.*[5] [Emphasis supplied.]

The Legislature thereby adopted, for causes of action arising on and after July 1, 1986, both the *Ross* definition of governmental function and the concept (expressed in *Parker*) that a governmental agency operating a general hospital was subject to tort liability and, as well, the concept (expressed in the companion case of *Perry v Kalamazoo State Hospital,* 404 Mich 205; 273 NW2d 421 [1978]), that a governmental agency operating a state mental hospital was not subject to tort liability.

Because Act 175 is not effective as to causes of action arising before July 1, 1986, this Court must decide whether to overrule *Parker* and, if so, whether to make such overruling effective before July 1, 1986.

The question is therefore whether a governmental agency operating a general hospital is subject to tort liability pursuant to *Parker* in respect to causes of action arising before the July 1, 1986, effective date of Act 175. We would hold that it is.

I

The question whether a governmental agency is immune from or subject to tort liability in respect to the operation of a hospital was not presented

---

[5] 1986 PA 175, amending MCL 691.1401 *et seq.;* MSA 3.996(101) *et seq.*

and therefore could not have been decided in *Ross.* We granted leave to appeal in these consolidated cases to decide whether the rationale developed in the *Ross* opinion should be extended to the operation of a hospital and *Parker* hence overruled.

Before this Court could decide that question, the Legislature indicated its general satisfaction with the results in *Ross, Parker,* and *Perry;* the Legislature adopted in Act 175 the *Ross* definition eliminating tort liability for all lawful governmental operations, but excepted, as set forth in *Parker,* the operation of a general hospital but not, as set forth in *Perry,* the operation of a state mental hospital.

The legislative adoption of the *Ross* definition of governmental function, and of the *Parker/Perry* distinction and qualification respecting general and state mental hospitals, were both made effective as to causes of action arising on and after July 1, 1986. The Legislature did not place its imprimatur on the *Ross* definition unmodified by the *Parker/Perry* distinction and qualification for causes of action arising before July 1, 1986.

We are obliged in construing legislation, in the instant case the governmental tort liability act, to search for and seek to implement the intent of the Legislature.

Where an amendment is enacted after controversy has arisen concerning the construction of an act, the amendment has, at times, been regarded by this Court as an expression of the legislative view of the original enactment—the purpose of the legislation being to clarify, because of the difference of opinion, the meaning of the original act rather than to work a substantive change of law. See *Detroit Edison Co v Dep't of Revenue,* 320 Mich 506, 519-520; 31 NW2d 809 (1948). Such an amendment has been viewed as a legislative ex-

pression of the "true construction and meaning" rather than a change in law. See *Bailey v Clark,* 88 US (21 Wall) 284, 288; 22 L Ed 651 (1875).

Act 175 expresses the legislative judgment, and thus declared as the public policy of the state, that all lawful governmental operations shall be regarded as governmental functions immune from tort liability except, among others, the operation of a general hospital.

II

In none of the nine cases decided in *Ross* was the service provided by government mainly provided in the private sector and largely funded in the same manner as like services provided in the private sector. Because *Ross* did not consider the factual situation presented in *Parker,* it cannot properly be said today that *Parker* was impliedly overruled by *Ross.*

When *Ross* was decided the Court, aware of *Parker,* left open the question of *Parker'*s continued viability in recognition of the impropriety of deciding a question not before it. A question left open to be decided at a later date could not have been impliedly decided when *Ross* was decided.

To be sure, there are situations where, because the facts and context are essentially the same as those in an earlier case, the Court could not properly fail to apply a rule announced in the earlier case and, hence, there has been an implied overruling by the earlier case of any still earlier contrary decision.

This is not such a case. While the language of the *Ross* definition of governmental function in terms left no room for a distinction, what was said in *Ross* should, under long-established principles, be read in the context of what was then before the

Court.[6] *Ross* dealt with governmental operations
and services that, while duplicated somewhat in
the private sector, are mainly provided and funded
by government and operations and services solely
provided and funded by government.

What was said in *Ross* could not foreclose this
Court from recognizing, when the issue was pre-
sented, the difference and distinction between one
governmental activity and another—the difference
and distinction between a governmental activity
mainly provided and funded by government and a
governmental activity mainly provided in the pri-
vate sector funded by users without significant
governmental subvention.

The opinion of the Court acknowledges that
"[n]one of the nine consolidated cases decided in
*Ross* involved the tort liability of a public general
hospital . . . ."[7] It nevertheless concludes that
*Ross* impliedly overruled *Parker* because *Ross* re-
jected all the definitions proffered by the justices
in *Parker* and because the definition stated in *Ross*
"is broad and encompasses most of the activities
undertaken by governmental agencies."[8] That ex-
planation begs the question whether *Ross* im-
pliedly overruled *Parker* by bootstrapping on the
obiter dictum of *Ross.*

To the extent that the *Ross* definition embraced
within its sweeping ambit "governmental" opera-
tions and services mainly provided in the private
sector and mainly funded by user fees—to the
extent it dealt with the question theretofore de-
cided in *Parker*—it went beyond the ambit of what
was before the Court for decision and beyond the
appropriate exercise of judicial authority.

What the Court says in an opinion beyond what

---

[6] See *Larzelere v Starkweather,* 38 Mich 96, 100 (1878).

[7] *Ante,* p 230.

[8] *Ante,* p 243, quoting *Ross, supra,* p 621.

is necessary to decision is necessarily obiter dictum. It can be rejected in a later case, as *Ross* rejected all the definitions of governmental function proffered in *Parker.*

What the Court does in a particular case rather than what it says is more likely to stand the test of time. What the Court did in *Ross* was to hold that operations of schools, the Departments of Natural Resources and Mental Health, 911 and police department operations—operations without an equivalent counterpart in the private sector, operations largely funded by taxes—are governmental functions within the intendment of the governmental tort liability act. That is all the Court did or could properly do.

### III

The view that *Ross* impliedly overruled *Parker* presupposes either that (i) there is no meaningful difference between such tax-supported governmental operations as police and fire departments, public schools, state-operated mental institutions, and the Department of Natural Resources, on the one hand, and user-supported government operations of a general hospital, on the other, or that (ii) this Court is incapable of defining the term "governmental function" in a manner both consistent with what the Court decided (as distinguished from what it said) in *Ross* and, in recognition of the difference and distinction between such governmental operations, consistent with what was decided in *Parker/Perry.*

The Supreme Courts of Pennsylvania, North Carolina, Kansas, and Minnesota,[9] along with this

---

[9] *Flagiello v Pennsylvania Hospital,* 417 Pa 486, 491-495; 208 A2d 193 (1965); *Sides v Cabarrus Memorial Hospital,* 287 NC 14, 18-19; 213 SE2d 297 (1975); *Carroll v Kittle,* 203 Kan 841; 457 P2d 21 (1969);

Court in *Parker/Perry,* differentiated between tax-supported governmental operations and the user-supported operations of a general hospital in holding that a general hospital is subject to tort liability.

Justice MOODY recognized the difference and distinction in *Parker/Perry.* By his fourth vote, he implemented the difference and distinction for six years.

It is within the competence of this Court to recognize the difference and distinction and to say, for example, that it is beyond the policy and intent of the Legislature—in excepting from the general rule of tort liability the operations of government that constitute a "governmental function"—to except from the general rule of tort liability the governmental operation of a general hospital because such hospitals, in contradistinction from other governmental operations, generally provide services obtained by most of the state's population in the private sector that are largely funded in the same manner as like services obtained in the private sector.

The Court might thus define (or redefine) "government function" for the period January 22, 1985 (the day *Ross* was announced), through June 30, 1986 (the day before Act 175 became effective), as any government activity, not ultra vires, other than a service mainly provided the state's population in the private sector that is largely funded, where provided in the public sector, in the same manner and from the same sources as like services obtained in the private sector.

If this Court were in these consolidated cases to recognize the distinction between a general hospital and all other government operations, and to so

*Stein v Regents of the Univ of Minnesota,* 282 NW2d 552 (Minn, 1979).

define or redefine *Ross,* the result would be the same as that enacted in Act 175. The exception for services mainly provided by, and largely funded in the same manner as like services obtained in, the private sector would plainly, because of the context in which stated, mean general hospitals.[10]

IV

The legislative adoption of the *Ross* definition was no more than a convenient way of stating what could be said in another way with the same result. Act 175 does not imply that the Legislature viewed *Ross* as overruling *Parker,* and most importantly the enactment of Act 175 did not imply that the Legislature viewed *Ross* as correctly overruling *Parker* and a correct expression of legislative intent.

"By adopting this narrow exception to the broad immunity granted by *Ross* and codified by 1986 PA 175, it is clear"[11]—not "that the Legislature believed that *Ross* had impliedly overruled *Parker*"[12] —but that the Legislature believed that the *Ross* formulation was deficient and inconsistent with sound public policy insofar as general hospitals are concerned.

V

If one focuses on the effective date of July 1, 1986, one could argue, and correctly so, that the Legislature did not make the rules announced in Act 175—the *Ross* definition modified by the *Par-*

---

[10] It does not appear whether any governmental entity other than the Department of Mental Health or Department of Corrections operates a psychiatric hospital.

[11] *Ante,* pp 245-246.

[12] *Ante,* p 246.

*ker/Perry* distinction and qualification—effective before July 1, 1986. It does not follow that the *Ross* definition should, to the extent it is obiter dictum, be effective before July 1, 1986, or that *Parker/Perry* are overruled or superseded before July 1, 1986.

This Court should not insist that its word formulation in *Ross,* rejected in this one application by the Legislature, must govern decision in this case. No grand design, plan, or symmetry would be offended by continuing the rule of *Parker* through July 1, 1986, the effective date of the new legislation.

The codification of the *Ross* definition effective July 1, 1986, as amended by the exception for general hospitals, means that the codification of the *Ross* definition as amended did not become effective until July 1, 1986. There is, to repeat, no implication from the July 1, 1986, effective date that the unamended *Ross* formulation is to be effective before July 1, 1986, or that it is codified and written in stone for the period of January 22, 1985, through June 30, 1986.

One can as readily argue that the application before July 1, 1986, of the *Ross* definition was rejected by the Legislature, as that the continued application of *Parker* through June 30, 1986, was rejected.

The question when, if at all, the obiter dictum of *Ross* becomes effective is a separate question which the Legislature left to the courts. This Court can readily justify delaying the effective date of the *Ross* dictum or modifying the dictum in recognition that it is dictum and the impolicy of creating a window of immunity by overruling *Parker.* There is nothing in the legislatively ordained July 1, 1986, effective date that militates for or against either result.

VI

*Parker* should not be overruled. The result of *Parker* is now the law for causes of action that arise on and after July 1, 1986. *Parker* has governed, since 1978, in hundreds, perhaps thousands, of lawsuits settled or tried on the basis of *Parker.* There are hundreds or perhaps thousands of cases pending in the courts where litigants and lawyers in reliance of *Parker* have expended considerable energy and large sums in cases awaiting trial. Partial settlements have been entered into and nonhospital defendants not named or released from liability in reliance on the rule of *Parker* in the expectation of a day in court against a governmental hospital defendant.

The argument that *Parker* was not precedentially binding because "no single definition had been adopted by a majority of this Court,"[13] ignores both the reliance by bench and bar on the rule of *Parker* and that the *Ross* definition is not precedentially binding beyond what was before the Court in *Ross* and properly then decided. The argument that "the consolidation of nine factually diverse cases should have signaled to the bench and bar that this Court was reevaluating the definition of 'governmental function' "[14] ignores that the Court could not properly reevaluate the definition of "governmental function" as applied to a general hospital because none of the nine factually diverse cases concerned the activities of a general hospital. The argument that litigants were warned by judicial dictum assumes that dictum is precedent. The argument that litigants were warned by the inability of four justices to agree on a rationale ignores the need, recognized in *Tebo v*

[13] *Ante,* p 240.
[14] *Ante,* p 240.

*Havlik,* 418 Mich 350; 343 NW2d 181 (1984), and *Gusler v Fairview Tubular Products,* 412 Mich 270; 315 NW2d 388 (1981),[15] of bench and bar to proceed in reliance on the last word from this Court until it speaks more decisively.

### VII

Even if *Ross* impliedly overruled *Parker* it would not be consequential if it is not overruled effective before July 1, 1986. The same considerations of fairness that prompted this Court to delay the effective date of the new rules announced in *Tebo* and *Gusler* require, at least, that the effective date of any overruling of *Parker* be delayed until January 22, 1985, the day the *Ross* definition (together with the *Ross* obiter dictum) was announced.

### VIII

The opinion of the Court states:

> We hold that the rules articulated in *Ross* apply to all cases commenced after January 22, 1985, the date our opinion was issued, and to those cases pending either in trial or appellate courts on January 22, 1985, in which a governmental immunity issue was properly raised and preserved.[16]

Footnote 35 of the opinion states:

> Unlike other claims of immunity, sovereign and

[15] Considered in terms of the justification for reliance by bench and bar, and thus considered in terms of "fairness," a decision of this Court, until reversed, whether or not four justices can agree on a rationale, should be regarded as at least as "clear and uncontradicted" (*ante,* p 240) as a decision of the Court of Appeals following which the sole action of this Court was to deny leave to appeal.

[16] *Ante,* p 230.

governmental immunity are not affirmative defenses, but characteristics of government which prevent imposition of tort liability. [Citations omitted.]

It thus appears that a governmental hospital need not plead governmental immunity as an affirmative defense and that the failure to plead an affirmative defense would not be a failure to "preserve" the governmental immunity issue. Nevertheless, under the Court's formulation, the issue must be "properly raised." The opinion does not state whether this might have been done by motion for summary judgment, in the pretrial statement,[17] or otherwise.

It appears, since the opinion of the Court speaks in the past tense—"*was* properly raised and preserved" (emphasis supplied)—that the governmental immunity issue must have been properly raised and preserved by January 22, 1985. If that is a correct reading, then if a motion for summary judgment were filed after January 22, 1985, it would be too late. And since the governmental immunity issue need not be raised as an affirmative defense, raising it by answer on or before January 22, 1985, might not be to "properly" "preserve" it.[18] (At least those are some of the arguments one can foresee in the trial courts in the hundreds, perhaps thousands, of cases affected by what is said in today's decision.)

If, as appears, the window of immunity announced by the Court today applies only to cases where motions for summary judgment were filed on or before January 22, 1985, the effect of the

---

[17] The Court of Appeals concluded in *Hyde* that the judge's statement in the pretrial statement did not "raise and preserve the challenge" absent plaintiffs' amending their complaint. See n 4.

[18] But see *Scudder v Annapolis Hospital,* 129 Mich App 280; 341 NW2d 504 (1983).

decision will indeed be less because there was no reason before this Court's decision in *Ross* to file such a motion.

*Parker* thus is *not* overruled as to cases commenced on or before January 22, 1985, in which the defendant hospital failed to file a premature motion for summary judgment and, possibly, also is not overruled as to cases in which the defendant hospital filed a superfluous affirmative defense. If a case was filed on, say, January 15, 1985, *Parker* would probably govern because the defendant hospital's answer was not due until after January 22, 1985. If, however, the defendant hospital filed a premature motion for summary judgment that was denied, *Parker* governs despite the expenditure of energy and money preparing the case for trial in reliance on that denial which presumably would have been predicated on *Parker.*

The Court has not adequately explained why it has reached such a peculiar result now that the Legislature has spoken and clearly said that the public policy of this state is that general hospitals are not immune from and rather are subject to tort liability.

ARCHER, J., concurred with LEVIN, J.

ARCHER, J. (*dissenting*). While I concur with Justice LEVIN's dissent, I write separately.

The Legislature has specifically provided that tort liability may be imposed upon a governmental agency that owns or operates a public general hospital or county medical facility. 1986 PA 175.[1]

---

[1] MCL 691.1407(4); MSA 3.996(107)(4) provides:

This act does not grant immunity to a governmental agency with respect to the ownership or operation of a hospital or county medical care facility or to the agents or employees of such hospital or county medical care facility. As used in this subsection:

In providing that these public hospitals cannot claim governmental immunity, the Legislature has approved the continuing validity of this Court's decision in *Parker v Highland Park,* 404 Mich 183; 273 NW2d 413 (1978). Although the act does not apply to these cases, the decision of the Legislature which will apply to future cases is a helpful and valuable guide.

In *Parker,* the majority held that public general hospitals are not immune from tort liability. None of the nine cases decided in *Ross* involved that issue. The Legislature decided not to grant immunity to governmental agencies that own or operate hospitals or county medical facilities and provided that the agents or employees of such hospitals were not immune from liability.

Months after the *Ross* decision, the Legislature held hearings on proposals to reform tort law in this state. Although the Legislature limited the noneconomic damages that some plaintiffs could recover in medical malpractice cases, other reforms were not enacted. The Legislature decided to retain tort liability for governmental agencies that own or operate certain general hospitals. Since the Legislature has expressed a clear judgment requiring certain public general hospitals to remain liable, this Court should respect that judgment. Legislators are elected representatives of the peo-

(a) "County medical care facility" means that term as defined in section 20104 of the public health code, Act No. 368 of the Public Acts of 1978, being section 333.20104 of the Michigan Compiled Laws.

(b) "Hospital" means a facility offering inpatient, overnight care, and services for observation, diagnosis, and active treatment of an individual with a medical, surgical, obstetric, chronic, or rehabilitative condition requiring the daily direction or supervision of a physician. The term does not include a hospital owned or operated by the department of mental health or a hospital operated by the department of corrections.

The act became effective July 1, 1986.

ple of this state. This decision is particularly unjust since *Parker* provides the plaintiffs with a remedy, and the Legislature has specifically provided redress for plaintiffs who are similarly situated whose causes of action happen to arise after 1986 PA 175 takes effect.

The government and its agents have a duty to act responsibly in the name of the people who authorize them to act. This is especially true in the area of public health where the sick and injured are especially vulnerable and must rely upon the professional expertise of their caretakers. In expanding the scope of governmental immunity in these cases, the Court is protecting the government and its agents from the legal consequences of negligent acts.

While absolute immunity from liability may be required in limited instances in order to allow some governmental agencies and employees the freedom in which to exercise their mandate from the people, such freedom is not justified in this case.

By authorizing the government to engage in certain activities, such as operating a public hospital, the public has not at the same time relieved the government of its duty to act with care.

As Justice LEVIN correctly observed in his partial dissent in *Ross:*

> Virtually all government activity is expressly or impliedly mandated or authorized by the constitution, a statute, or other law. By perusing the statute books rather than focusing on the specific activity complained of by the plaintiff, the Court casts the net of governmental immunity too far, enabling a governmental entity to expand the scope of its immunity by promulgating an ordinance or other law relating to its activities. [*Ross* at 684.]

The majority here cites statutory authority which empowers public hospitals to function in the name of the people and then maintains that the same statute immunizes the agency and its employees when they breach the very responsibilities the statute created. The answer to the agency's liability should be determined by focusing upon the specific act or omission of the agency, not by citing the overall governmental objective of the agency.

The determination whether a governmental agency acted within the limits of its authority still requires judicial interpretation. To state that an activity is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law adds little to the analysis we must use to determine the nature of the responsibilities of the agency and whether the specific acts alleged were beyond the public mandate.

Because the majority ignores the precedence of *Parker,* and extends the immunity of government to an unacceptable degree, I dissent.