*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF ZACHARY ADAMS, by BRENT
ADAMS and LOU ANN MORGAN, personal
representatives,

UNPUBLISHED
September 24, 2020

Plaintiffs-Appellants,

v

No. 341472
Grand Traverse Circuit Court
LC No. 2016-031740-NO

TRAVERSE CITY LIGHT AND POWER,

Defendant-Appellee,

and

TREES, INC.,

Defendant.

Before: STEPHENS, P.J., and SERVITTO and RONAYNE KRAUSE, JJ.

PER CURIAM.

In this wrongful death action, the Estate of Zachary Adams, by co-personal representatives Brent Adams and Lou Ann Morgan, appeal by leave granted[1] the trial court's order granting summary disposition in favor of defendant, Traverse City Light and Power (defendant[2]), under MCR 2.116(C)(7) (immunity granted by law). In so ruling, the trial court found that defendant was entitled to governmental immunity under the Governmental Tort Liability Act (GTLA), MCL

---

[1] See *Adams v Traverse City Light and Power*, unpublished order of the Court of Appeals, entered July 18, 2018 (Docket No. 341472).

[2] Trees, Inc., is neither a party to this appeal nor relevant to the issue raised on appeal, so we will refer to only Traverse City Light and Power as "defendant."

691.1401 *et seq.*, because there was no question of fact that the "proprietary function" exception to governmental immunity applied. We affirm.

## I. BACKGROUND

Defendant is a municipal corporation providing electrical services to nearly 13,000 residential and commercial customers in the city of Traverse City (the City), Michigan, and the surrounding areas in six townships. The parties agree that defendant is engaged in a governmental function. Relevant to this matter, defendant entered into an exclusive contract with Trees, Inc., to clear tree limbs along defendant's electrical infrastructure. In turn, Trees, Inc., employed plaintiffs' decedent, Zachary Adams, as a tree trimmer. In August 2013, the decedent suffered a fatal injury when he was electrocuted by coming into contact with one of defendant's high-voltage transmission lines while trimming a tree. Plaintiffs brought the instant action, which alleged several theories of liability against defendant. Plaintiffs pleaded that governmental immunity did not apply because two of its claims, nuisance per se and intentional nuisance, were exceptions to governmental immunity, and its other claims were viable because defendant was engaged in a proprietary function under MCL 691.1406.

After the close of discovery, defendant moved for summary disposition, arguing that it was entitled to governmental immunity under MCR 2.116(C)(7), that plaintiffs failed to state a claim under (C)(8), and that no genuine issue as to any material fact existed under (C)(10). The parties primarily focused on governmental immunity. Plaintiffs agreed that defendant was engaged in a governmental function. However, plaintiffs argued that, despite the testimony from the defendant's executive director and comptroller that the primary purpose of the enterprise was to provide low-cost reliable energy, a thorough analysis of the financial documents and business model could lead a reasonable trier of fact to conclude that its real primary purpose was pecuniary gain. At the conclusion of the hearing, the court rejected plaintiffs' argument that defendant was engaging in a proprietary function. The trial court expressed concern about plaintiffs' argument that, at some point, an entity might be so profitable that it could no longer be plausibly serving the best interests of its citizenry. However, it did not believe defendant had crossed that line, wherever that line might be. It therefore concluded that the facts that defendant was profitable and was operated for the benefit of the City were insufficient to establish that its primary purpose was to generate a profit. It specifically commented that, "[t]he primary purpose can be to provide a utility to the local community despite the amount of revenue or profit earned." The trial court also rejected plaintiff's nuisance claims as providing exceptions to governmental immunity.[3] The trial court therefore granted summary disposition in favor of defendant. Plaintiffs moved for leave to amend their complaint, but the trial court entered an order staying the proceedings before ruling on that motion.

## II. STANDARD OF REVIEW

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Under MCR 2.116(C)(7), where the claim

---

[3] Plaintiffs do not specifically dispute the trial court's ruling as to their nuisance claims.

is allegedly barred, the trial court must accept as true the contents of the complaint, unless they are contradicted by documentary evidence submitted by the moving party. *Id*. at 119. "Further, the determination regarding the applicability of governmental immunity and a statutory exception to governmental immunity is a question of law that is also subject to review de novo." *Snead v John Carlo, Inc*, 294 Mich App 343, 354; 813 NW2d 294 (2011). Because the application of the proprietary function exception is a question of law, any genuine question of fact found outstanding at the time of a summary disposition motion *must* be resolved by further factfinding. *Dextrom v Wexford Co*, 287 Mich App 406, 430-433; 789 NW2d 211 (2010). Even on appeal, if we conclude that the record is insufficient, we must remand for further factual development. *Id*. Conversely, if the trial court arrives at the correct result, we may uphold its ruling on appeal even if the trial court relied on flawed reasoning. *Mulholland v DEC Internat'l Corp*, 432 Mich 395, 411 n 10; 443 NW2d 340 (1989).

## III.  APPLICABLE LAW

Under the GTLA, governmental entities are immune from tort liability arising out of their exercise or discharge of a governmental function unless a statutory exception applies. MCL 691.1407(1); *Mack v City of Detroit*, 467 Mich 186, 204; 649 NW2d 47 (2002). "This Court broadly construes the scope of governmental immunity." *Milot v Dept of Transp*, 318 Mich App 272, 276; 897 NW2d 248 (2016). And the statutory exceptions must be construed narrowly. *Maskery v Bd of Regents of Univ of Mich*, 468 Mich 609, 614; 664 NW2d 165 (2003). "[G]overnmental immunity is not an affirmative defense, but is instead a characteristic of government," and parties "seeking to impose liability on a governmental agency" have the burden of establishing the applicability of one of the exceptions. *Fairley v Dep't of Corrections*, 497 Mich 290, 298; 871 NW2d 129 (2015).

There is no dispute that defendant was engaged in a governmental function. Only one possible exception to governmental immunity is at issue:[4] the "proprietary function" exception, which is defined as "any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees." MCL 691.1413.

For plaintiffs to avail themselves of the proprietary function exception, "[t]wo tests must be satisfied: "The activity (1) must be conducted primarily for the purpose of producing a pecuniary profit, and (2) it cannot be normally supported by taxes and fees." *Coleman v Kootsillas*, 456 Mich 615, 621; 575 NW2d 527 (1998). Several considerations are relevant to the above two tests, but none of them are dispositive. See *Hyde v Univ of Mich Bd of Regents*, 426 Mich 223, 258-260; 393 NW2d 847 (1986). Profitability may suggest that an activity is intended to produce a profit, but the exception "permits imposition of tort liability only where the *primary* purpose is to produce a pecuniary profit," not an "agency's legitimate desire to conduct an activity on a self-sustaining basis." *Id*. at 258-259 (emphasis in original). Another important consideration is whether the activity's revenues are deposited in a general fund and used for unrelated purposes, or are used to defray the activity's own costs and expenses. *Id*. at 259. The scope of the activity and the scale of its revenues, and whether either would generally be supported by the governmental

---

[4]  We emphasize that our analysis is limited only to the issues presented to us in this appeal.

entity's community, is relevant to "whether the activity is one 'normally supported by taxes or fees.' " *Coleman*, 456 Mich at 622-623. Whether the activity is *actually* supported by taxes or fees is not dispositive. *Id*.; *Hyde*, 426 Mich at 260 n 32.

## IV. ANALYSIS

## A. PRIMARY PURPOSE

According to the Traverse City Charter, its municipally owned utilities, including defendant, "shall be operated for the benefit of the City of Traverse City." The Charter specifies that defendant's funds "shall be kept separate from the general fund of the City of Traverse City," but other than maintaining an emergency reserve account, "further net profits shall revert to the general fund of the City of Traverse City." Those reverted funds are to be used to reduce the utility's indebtedness and to make improvements to the utility's facilities, but also to reduce the City's indebtedness and to supplement the City's tax revenues.

According to defendant's Strategic Plan, its "vision statement" is "to build the long-term value of Traverse City Light & Power for the benefit of the City and its residents and all Traverse City Light & Power customers." Its "mission statement" is "to provide the Public Power benefits of safety, lower rates, high reliability, local control and exceptional customer service to the City and its residents and all Traverse City Light & Power customers." The City Charter requires defendant to pay five percent of its gross annual revenue to the City as "the annual fee." However, further payments may be made to the city "upon concurrent resolution duly adopted by a majority of [defendant's] Board and a majority of the City Commission." On one occasion, defendant did adopt such a resolution: in 2012, defendant made a one-time $1 million contribution to the City's "Bayfront Plan," a park revitalization project, in commemoration of defendant's 100th anniversary. Defendant's resolution indicated, among other things, that the contribution would not affect its projects or its customers' rates.

The provided evidence establishes that in a typical year, defendant generates approximately $34 million in revenues, more than 90 percent of which stems from rates charged to customers. Under its operating budget, defendant typically incurs $32 million in operating expenses, which includes, *inter alia*, the clearing of tree limbs along circuits and the payment of the city fee. These expenses are paid from defendant's revenues. Over the eight years preceding the grant of summary disposition, with the exception of 2013 when defendant operated at a loss of approximately $2.5 million, defendant had generated revenue in excess of expenses ranging from under $1 million to just over $4.5 million, for an approximate average of $2.2 million per year.

Defendant deposits excess revenue in a reserve fund used to finance its own large-scale, long-term capital projects. The city commission, in its oversight function of both the budget and the capital improvement plan, approves the determination of excess revenue. These reserves are held by the city treasurer in a separate fund. The funds are generally used for self-sustaining activities, like to finance capital improvements, such as line improvements or extensions to the utility's infrastructure. A six-year capital improvement plan, adopted each year, projects defendant's capital needs and prioritizes defendant's capital improvement projects going forward. This reserve account generally held approximately $21 million. Timothy Arends, defendant's

executive director, testified at deposition that defendant's power board decides what to do with that money and the City has not asked for or used the money in the reserve account.

Arends further testified that defendant does not "mark-up" energy that it purchases from other providers to its customers. In other words, defendant does not make money on the power it sells to its customers. Arends testified that defendant's primary purpose was not to create a profit. Karla Myers-Brown, defendant's controller, testified to the same. Myers-Brown testified at her deposition that defendant works with a financial consultant to, in accordance with municipal utility practices, operate at a breakeven amount. According to Myers-Brown, defendant's goal is not to make a profit, but to set and reach a target operating income to recover depreciation expenses plus the inflationary cost to replace those assets. Myers-Brown also swore in an affidavit that all funds generated from defendant's activities are deposited into the Traverse City Light and Power fund, not the City's general fund, and again affirmed that the primary function of defendant is not "for the purpose of producing profit."

From the evidence presented, it is apparent that defendant's *primary* purpose is not pecuniary profit. It appears instead that, while defendant may make a profit, its legitimate desire is to conduct its activities on a self-sustaining, breakeven basis. Again, the pecuniary gain exception "permits imposition of tort liability only where the *primary* purpose is to produce a pecuniary profit," not an "agency's legitimate desire to conduct an activity on a self-sustaining basis." *Hyde*, 426 Mich at 258-259 (emphasis in original). The bare fact that the activity happens to make a profit proves nothing.

In addition, the activity's revenues are not deposited in a general fund and used for unrelated purposes; rather, they are overwhelmingly used to defray the activity's own costs and expenses. *Hyde*, 426 Mich at 259. The five percent of defendant's gross revenues that it is required to pay to the City would seem to be a small portion of those revenues, and we have no information about how much of the City's revenue is made up of that five percent annual fee. In this sense, the instant matter differs greatly from *Coleman*, which plaintiffs rely heavily upon, because in that case the evidence clearly established that the landfill operation at issue was a significant funding source for numerous city projects and a significant contributor to lowering the city's millage rates. *Coleman*, 456 Mich at 621-622. We also have not been pointed to any information about how much of defendant's initial funding and creation was subsidized by the City, and the extent to which the five percent fee could be considered to be, say, a capital repayment for any of defendant's considerable physical assets.

Plaintiffs' focus on only the raw dollar-value of defendant's revenues, profits, or disgorgements of money to the City is misguided. Our Supreme Court has emphasized that the focus is on an activity's *primary* purpose, which requires us to consider any such dollar values in context. That context would naturally include such things as the total percentage of the activity's costs and revenues. While defendant's annual revenue ranged from $32 million to $37 million and defendant typically did not run deficits, the overwhelming majority of defendant's gross revenues are clearly reinvested back into its own operations. And, while the average excess revenue of $2 million per year seems to be a high number, given that its yearly operating expenses

top $30 million, it is not unreasonable for defendant to maintain a large reserve.[5]  We thus find that the primary purpose of defendant's activities is not pecuniary profit.  To find otherwise would be to penalize sound and responsible financial decisions by a municipal utility.

Plaintiffs' reliance on the $1 million contribution made by defendant to the City's park project to support its position to the contrary has no effect on our determination.  That appears to have been a one-time donation for a special occasion that, at least ostensibly, had some direct relevance to defendant itself.  As defendant points out, the money did not go into a general fund, nor was it spent for a purpose *entirely* unrelated to defendant's operation.  Plaintiffs make a notable point that defendant was obviously able to operate at a loss for that year with no real consequences. However, the evidence indicates that the loss may not have been due to the donation, or at least not entirely due to the donation.  According to defendant's 2013 financial statement, its "operating expenses increased approximately $2,530,000 from fiscal year 2011-2012 due in large part to increased power supply costs and the $1,000,000 contribution made to the City for the Clinch Park Revitalization Project."  Arends testified that the loss was because defendant's "Board took action to cap its power cost recovery, which fluctuates from month to month" so "the full cost of the power was not being passed on to the customers."  Ultimately, the most important fact is that plaintiffs provide no evidence of any kind of pattern of such donations.  A single event proves possibility, but not propensity.

## B.  NORMALLY SUPPORTED BY TAXES OR FEES

Because we have determined that defendant's primary purpose in conducting its activities was not pecuniary gain, we could simply affirm the trial court without considering whether the activity was one "normally supported by taxes and fees."  *Coleman*, 456 Mich at 621.  This is necessarily so because the statutory language of MCL 691.1413 indicates that the "normally supported by taxes and fees" prong of the proprietary function test is essentially an exception to the definition of what constitutes a proprietary function.  It is to be addressed only if it is first determined that the activity was conducted primarily for the purpose of producing a pecuniary profit.  For example, in *Herman v City of Detroit*, 261 Mich App 141, 146; 680 NW2d 71 (2004), this Court, in determining that "[t]he operation of the public lighting department is a governmental, and not a proprietary, function" did not look at whether the activity was generally supported by taxes and fees.  Once that Court found that the activity was not primarily conducted for pecuniary profit, it simply found that the activity at issue did not meet the proprietary function exception to governmental immunity and that governmental immunity thus applied.  This Court used the same approach in *Goodhue v Dept of Transp*, 319 Mich App 526, 531-534; 904 NW2d 203 (2017), *Transou v City of Pontiac*, 283 Mich App 71, 73-75; 769 NW2d 281 (2009), and *Ward v Michigan State Univ (On Remand)*, 287 Mich App 76, 85-86; 782 NW2d 514 (2010).

As a result, because this Court has found that defendant's activity was not conducted primarily for pecuniary profit, defendant is entitled to governmental immunity.  However, even if we had determined that the converse was true, we would nevertheless find that defendant was

---

[5] We note that a not insignificant amount of nonoperating revenues comes from interest earned.

entitled to governmental immunity because the activity at issue was "normally supported by taxes and fees." MCL 691.1413.

Although it is possible for "or" to have some flexibility in its meaning under some circumstances, it is typically understood to indicate a disjunction. See *Blumenthal v Berkshire Life Ins Co*, 134 Mich 216, 219; 96 NW 17 (1903); *Heckathorn v Heckathorn*, 284 Mich 677, 680-682; 280 NW 79 (1938); *Mich Pub Serv Co v City of Cheboygan*, 324 Mich 309, 341-342; 37 NW2d 116 (1949). Here, the word "or" unambiguously indicates two independently-sufficient alternatives: either the activity is normally supported by taxes, or the activity is normally supported by fees.

Taxes and fees are different kinds of burdens, but it is not always straightforward to determine which is which. See generally *Dawson v Secretary of State*, 274 Mich App 723; 738-739 NW2d 339 (2007). The name applied to a burden imposed by a public authority is not binding. *City of Dearborn v Mich State Tax Comm*, 368 Mich 460, 471; 118 NW2d 296 (1962). Generally, a "fee" must be for the purpose of regulation rather than revenue, must be proportionate to the necessary costs of a service, and must be voluntarily exchanged for receipt of that service. *Bolt v City of Lansing*, 459 Mich 152, 161-162; 587 NW2d 264 (1998). To constitute a tax rather than a fee, the charge must be "wholly out of proportion to the expense involved." *Merrelli v City of St Clair Shores*, 355 Mich 575, 584; 96 NW2d 144 (1959) (quotation omitted). However, "[i]f revenue is incidentally derived which is not so disproportionate as to make the fee charged unreasonable," a purported fee will not be deemed a surreptitious tax. *Vernor v Secretary of State*, 179 Mich 157, 168; 146 NW 338 (1914), superseded by statute in part on other grounds as stated in *Mich Ass'n of Home Builders v City of Troy*, 504 Mich 204, 224; 934 NW2d 713 (2009).

Plaintiffs make a persuasive argument that defendant's operation would not normally be supported by *taxes*. However, we are not persuaded by plaintiffs' argument that defendant's operation would not normally be supported by *fees*.

We reject plaintiffs' argument that "fees" as used in MCL 691.1413 must be compulsory. *Bolt*, 459 Mich at 161-162. No specific definition mandating such a conclusion is present in the GTLA, so we give the word "fees" its well-established plain and ordinary meaning. *Krohn v Home-Owners Ins Co*, 490 Mich 145, 156-157; 802 NW2d 281 (2011). We are also unpersuaded by plaintiffs' argument that the geographic scope of defendant's activity is determinative. It is not dispositive for purposes of the proprietary function exception whether a particular governmental entity's specific activity is actually supported, or even supportable, by taxes or fees. *Coleman*, 456 Mich at 622-623; *Hyde*, 426 Mich at 260 n 32. As a matter of common, everyday experience and knowledge, electrical utility services are ordinarily supported by fees: electrical power is normally supplied to customers in exchange for sums of money based on the amount of power consumed and the cost of providing that power. This Court has held that where a city's water utility's rates were regulated by statute and constrained to the cost of the service, the city's water department could not be conducting a proprietary activity. *Davis v City of Detroit*, 269 Mich App 376, 379; 711 NW2d 462 (2005). Electrical utility rates are similarly heavily regulated by the Michigan Public Service Commission pursuant to statute. See MCL 460.6a(1), MCL 460.11.

Finally, plaintiffs argue that defendant was obligated to provide evidence comparing its fees and profitability to those of similar communities. Plaintiffs misapprehend the applicable

burdens.  As noted, plaintiff has the burden of proving entitlement to an exception to governmental immunity.  *Fairley*, 497 Mich at 298.  This Court held in a prior case involving different facts and a different kind of operation that the trial court should consider the defendants' landfill in comparison to other communities' landfills.  *Dextrom*, 287 Mich App at 426.  However, *Dextrom* did not alter traditional principles of which parties have the burdens of proof or persuasion.  In light of our analysis above, we are unpersuaded that any evidence was necessary.  "The term 'governmental function' is to be broadly construed, and the statutory exceptions are to be narrowly construed."  *Maskery*, 468 Mich at 614.  Electrical utility services are commonly understood to be supported by fees, and intensive regulation of those fees by statute and the Michigan Public Service Commission indicate that provision of electrical utility services is not a proprietary activity.

Affirmed.  We order that the parties shall bear their own costs.  MCR 7.219(A).


/s/ Deborah A. Servitto
/s/ Amy Ronayne Krause